IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,
100 F Street, N.E.
Washington, DC 20549,

                Plaintiff,

                v.                            Civil No.

ONE OR MORE UNKNOWN TRADERS IN
THE COMMON STOCK OF CERTAIN ISSUERS,

                Defendants,
      and

JSC PAREX BANK,

                Relief Defendant.

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, ORDER TO SHOW CAUSE, ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") hereby moves *Ex Parte* for an order (1) Temporarily Restraining One or More Unknown Traders in the Common Stock of Certain Issuers ("Unknown Trader Defendants") from violating Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (2) Freezing the Assets of Unknown Trader Defendants and Relief Defendant Parex Bank ("Relief Defendant Parex);(3) Ordering Unknown Trader Defendants to Show Cause Why a Preliminarily Injunction Should Not Be Issued Enjoining Defendants from future violations of the respective provisions of the securities

laws mentioned above; (4) Providing for Expedited Discovery; (6) Preventing

Destruction of Evidence; (6) Directing Relief Defendant Parex to file a report Identifying

the Unknown Trader Defendants and Accounting for the Transactions in the accounts

described in the Complaint titled in the name of Parex; and (7) Preventing Document

Alteration or Destruction.

The Commission respectfully refers the Court to the Complaint, its Statement of

Points and Authorities in support of this Motion, and the Declarations filed herewith for

the reasons for this motion.

The Commission also respectfully refers the Court to the Motion to File Under

Seal and for an *Ex Parte* Hearing on this Motion for the reasons why this Motion should

be granted *Ex Parte*.

Respectfully submitted,

Dated:  March 6, 2007

Kenneth Guido, Trial Counsel
(D.C. Bar No. 151605)
John Reed Stark
Thomas A. Sporkin
N. Blair Vietmeyer
Sarit Klein
David Smyth
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, DC 20549
(202) 551-4480 (Guido)
(202) 772-9245 (Fax)
Email: guidok@sec.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**<br>**100 F Street, N.E.**<br>**Washington, DC 20549,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **Civil No.** |
| | : | |
| **ONE OR MORE UNKNOWN TRADERS**<br>**IN THE COMMON STOCK OF CERTAIN**<br>**ISSUERS,** | : | |
| | : | |
| **Defendants,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JSC PAREX BANK,** | : | |
| | : | |
| **Relief Defendant.** | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A
TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE,
PRELIMINARY INJUNCTION AND ORDER GRANTING OTHER RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.    PRELIMINARY STATEMENT ...................................................................2

II.   FACTUAL SUMMARY ...............................................................................3

      A.  Relevant Parties and Entities ..............................................................3

      B.  Evolution and Overview of the Online Intrusion Scheme ...........................................4

      C.  The Unknown Trader Defendants Trade Anonymously
          Through Accounts Titled in the Name of Relief Defendant
          Parex Bank ............................................................................................5

      D.  Details of the Unknown Trader Defendants'
          Online Intrusion-Manipulation Scheme ..............................................6

      E.  The Unknown Trader Defendants Further Masked
          Their Identities By Intruding Into the Accounts Through Hijacked ...........................9

III.  LEGAL ANALYSIS .....................................................................................10

      A.  This Motion Satisfies the Special Standard Applicable
          to Requests by the Commission for a Temporary
          Restraining Order and Preliminary Injunction ................................10

          1.  The Commission is Substantially Likely to
              Succeed in Establishing that the Unknown Trader
              Defendants Have Violated the Antifraud Provisions
              of the Exchange Act and the Securities Act .................................11

              a.  The Unknown Trader Defendants' Fraudulent
                  Conduct is in the Purchase and Sale of Securities ...........................13

              b.  The Unknown Trader Defendants Acted with
                  Scanter in Perpetrating Their Fraudulent Scheme ...........................15

          2.  There is a Reasonable Likelihood That the Unknown
              Trader Defendants' Wrongdoing Will Be Repeated ...........................17

B. The Court Should Issue an Order Freezing the Assets
   Held In Relief Defendant Parex's Brokerage Accounts
   At Pinnacle ................................................................................................18

C. The Court should order Expedited Discovery and the
   Preservation of Documents .......................................................................20

D. The Court should order Relief Defendant Parex to
   Repatriate Funds .......................................................................................21

IV. CONCLUSION .................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.T. Brod. & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967)................................................14

*Aaron v. SEC*, 446 U.S. 680 (1980)................................................................................15

*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)...........................................21

*Dirks v. SEC*, 463 U.S. 646 (1983)................................................................................12

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).....................................................12,15

*In re Feit & Drexler, Inc.*, 760 F.2d 406 (2d Cir. 1985)................................................21

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000)........................................................13,14

*Gray v. First Winthrop Corp.*, 82 F.3d 877 (9th Cir. 1996)............................................16

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999)........................................................12

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944)....................................................................10

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)...........................................15,16

*Inter-Regional Financial Group, Inc. v. Hashemi*, 562 F.2d 152 (2d Cir. 1977),
    *cert. denied*, 434 U.S. 1046 (1978)........................................................................21

*Lincoln Hockey Ltd. Liability Co. v. Semin*, No. Civ.A.05-02094 (HHK), 2005
    WL 3294008, (D.D.C. Dec. 5, 2005).......................................................................20

*Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325 (1960)............................................16

*SEC v. Aleksey Kamardin*, Civil Action No. 8:07-CV-159-T24MAP (M.D.Fla.
    Jan. 25, 2007).........................................................................................................5

*SEC v. Bankers Alliance Corp.*, Civ. No. 95-0428 (PLF), 1995 WL 590665
    (D.D.C. May 5, 1995)..............................................................................................21

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) ..........................................................10

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .......................................................17,18

*SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90 (2d Cir. 1978) ...............18

*SEC v. Current Financial Services, Inc.*, 798 F.Supp. 802 (D.D.C. 1992) ........................18

*SEC v. First City Financial Corp., Ltd.,* 890 F.2d 1215 (D.C. Cir 1989)..........................15

*SEC v. Grand Logistic, S.A. et al.*, Civil Action No. 06-15274 (S.D.N.Y. Dec. 19, 2006) ..................................................................................................................................5

*SEC v. Graystone Nash, Inc.*, 820 F.Supp. 863 (D.N.J. 1993), *rev'd on other grounds*, 25 F.3d 187 (1994)..........................................................................................12

*SEC v. Interlink Data Network of Los Angeles*, Civ. No. 93-3073R, 1993 WL 603274 (C.D. Cal., Nov. 15, 1993) ..............................................................................20

*SEC v. International Loan Network, Inc.*, 770 F.Supp. 678 (D.D.C. 1991) .................11,19

*SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1 (D.D.C. 1998) .........................................20

*SEC v. Life Partners, Inc.*, 898  F.Supp. 14 (D.D.C. 1995).............................................10

*SEC v. Lohmus Haavel & Viiseman*, 05 Civ. 9259 (RWS), 2005 WL 3309748 (S.D.N.Y. Nov 8, 2006) ..............................................................................................21

*SEC v. Management Dynamics, Inc.*, 515 F. 2d 801 (2nd Cir. 1975) ............................10,17

*SEC v. Musella*, 578  F.Supp. 425 (S.D.N.Y. 1984)........................................................18

*SEC v. Rana Research, Inc.*, 8 F.3d 1358(9th Cir. 1993) ................................................14

*SEC v. Santos*, 355 F.Supp.2d 917 (N.D. Ill 2003)..........................................................12

*SEC v. Singer*, 786 F. Supp. 1158 (S.D.N.Y. 1992) .......................................................16

*SEC v. Stratton Oakmont, Inc.*, 878 F. Supp. 250 (D.D.C. 1995) ....................................10

*SEC v. Sterns*, No. CV91-1303, 1991 WL 204901 (C.D. Cal Apr. 25, 1991).................20

*SEC v. U.S. Environmental, Inc., et al.*, 82 F.Supp.2d 237 (S.D.N.Y. 2000)...............12,15

*SEC v. Unifund SAL*, 910 F.2d 1028 (2nd Cir. 1990) ............................................. 10,19-20

*SEC v. United Communications, Ltd.*, 899 F. Supp. 9 (D.D.C. 1995)..............................18

*SEC v. Vaskevitch*, 657 F. Supp. 312 (S.D.N.Y. 1987) ...................................................18

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) ....................................................................16

*SEC v. Zandford*, 535 U.S. 813 (2002) ............................................................13,14

*Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971) ............14

*United States v. Charnay*, 537 F.2d 341 (9th Cir. 1976) .........................................12

*United States v. First National City Bank*, 379 U.S. 378 (1965) .......................................19

*United States v. Larrabee*, 240 F.3d 18 (1st Cir. 2001) ......................................................16

*United States v. Naftalin*, 441 U.S. 768 (1979) .............................................................11,14

*United States v. Rhodes*, 886 F.2d 375 (D.C. Cir. 1989) ..........................................15

*United States v. Sungard Data Systems, Inc.*, 172 F.Supp.2d 172 (D.D.C. 2001) ............20

*Zweig v. Hearst Corp.*, 594 F.2d 1261(9th Cir. 1979)...........................................16

## FEDERAL STATUTES

**Securities Act of 1933**
Section 17 (a)............. [15 U.S.C. § 77q(a)] ...........................................1,11,12,14,15
Section 17 (a)(1)......... [15 U.S.C. § 77q(a)(1)] .............................................................11
Section 20(d)            [15 U.S.C. § 77t(d)]...................................................................19

**Securities Exchange Act of 1934**
Section 10(b)..............[15 U.S.C. § 78j(b)]........................................................ 1,11-15
Section 21(d)..............[15 U.S.C. § 78u(d)]...............................................................10,19
Rule 10b-5................ [17 C.F.R. § 240.10b-5] ........................................................1,12,14
Rule 10b-5(a)............[17 C.F.R. § 240.10b-5(a)] .......................................................11
Rule 10b-5(c)............[17 C.F.R. § 240.10b-5 (c)] ......................................................11

Fed.R.Civ.P. 65 .............................................................................................................1

LCvR 65.1(a) ...............................................................................................................1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, DC 20549, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil No. |
| | : | |
| ONE OR MORE UNKNOWN TRADERS<br>IN THE COMMON STOCK OF CERTAIN<br>ISSUERS, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| JSC PAREX BANK, | : | |
| | : | |
| Relief Defendant. | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A
## TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE,
## PRELIMINARY INJUNCTION AND ORDER GRANTING OTHER RELIEF

Pursuant to LCvR 65.1(a), Fed. R. Civ. P. 65(b) and the federal securities laws

cited herein, Plaintiff the Securities and Exchange Commission ("Commission")

respectfully submits this Memorandum of Points and Authorities in support of its *Ex

Parte* Motion for a Temporary Restraining Order, Order to Show Cause, Preliminary

Injunction and Order Granting Other Relief against the defendants in this action.  The

Commission seeks this relief because, as alleged in its Complaint and explained below, it

has found sufficient evidence to conclude that the defendants have violated Section 17(a)

of the Securities Act of 1933 [15 U.S.C. § 77q(a)] ("Securities Act"), Section 10(b) of the

Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ("Exchange Act") and Rule 10b-5

[17 C.F.R. § 240.10b5] promulgated thereunder.

## I.  PRELIMINARY STATEMENT

This action stems from a modern, high-tech version of the traditional "pump-and-dump" market manipulation scheme.  The Commission seeks this immediate *ex parte* relief because the defendants are engaged in an ongoing fraud involving securities traded on exchanges located in the United States.  Specifically, the defendants are trading in the common stock of issuers quoted on the National Association of Securities Dealers Automated Quotation System (Nasdaq) whose share prices are being manipulated through unauthorized intrusions and trading in online brokerage accounts of unsuspecting customers at U.S. broker-dealers.  In perpetrating their scheme, the defendants, or others connected to them, are masking their identities by intruding into the online accounts using the Internet Protocol addresses of innocent third parties, and by trading anonymously through the domestic brokerage account of Latvian-based Relief Defendant JSC Parex Bank.[1]

Emergency relief is warranted because in recent months, Relief Defendant Parex has wired substantial sums from its domestic brokerage account to an offshore account located in Riga, Latvia.  Accordingly, to prevent the further dissipation of assets by Parex and retain the fraudulent proceeds and any civil penalties the Court may impose within reach of this Court, the Commission seeks to freeze that portion of Parex's account representing the defendants' ill-gotten gains, plus penalties and prejudgment interest.

---

[1]  The Internet Protocol ("IP") is the method or protocol by which data is sent from one computer to another on the Internet.  Each computer (known as a "host") on the Internet has at least one IP address that uniquely identifies it from all other computers on the Internet.  In this regard, the IP address information is equivalent to a telephone number.

Such a freeze merely will preserve the status quo pending the Court's determination of the Commission's request for injunctive relief.

## II.    **FACTUAL SUMMARY**[2]

### A.    **Relevant Parties and Entities**

The Defendants:  (hereinafter "Unknown Trader Defendants") are one or more individuals or entities whose identities and addresses are unknown to the Commission at this time because each anonymously traded in securities through brokerage accounts titled in the name of JSC Parex Bank. *Conroy Decl. ¶13, 33.*  Between December 2005 and December 2006, the Unknown Trader Defendants purchased and sold, or caused to be purchased and sold, shares of the common stock of fifteen companies, each of which was the subject of unauthorized trading in intruded accounts of customers at various U.S. broker-dealers on the same days that the Unknown Trader Defendants traded the stocks. *Conroy Decl. ¶19.*  To date, the Unknown Trader Defendants' net profit from trading in these fifteen companies has totaled at least $732,941. *Conroy Decl. ¶86.*

Relief defendant JSC Parex Bank ("Relief Defendant Parex") is a foreign entity whose address is 3 Smilshu Street, Riga, Latvia, LV-1522. *Conroy Decl. ¶16; Miller Decl. ¶4.*  Parex holds an omnibus trading account, with seventy-five (75) sub-accounts

---

[2]  The facts set forth herein are supported by the accompanying Declarations: (1) Declaration of Thomas Conroy, Market Surveillance Specialist in the Commission's Division of Enforcement (Conroy Decl. ¶__); (2) Declaration of James Autrey, Senior Manager of Corporate Security Investigations for E*Trade Financial Corporation (Autrey Decl. ¶__); (3) Declaration of Ellis Hough, Risk Management Manager for Scottrade, Inc. (Hough Decl. ¶__); (4) Declaration of James M. Heeney, Managing Director of Compliance Operations for TD Ameritrade, Inc. (Heeney Decl. ¶__); (5) Declaration of Mark Stewart, Vice President, Loss Prevention and Fraud, for Charles Schwab & Co., Inc. (Stewart Decl. ¶__); (6) Declaration of Edward Moore, Senior Vice President of Fidelity Brokerage Services, LLC (Moore Decl. ¶__); (7) Declaration of Richard L. Mandel, Vice President and Chief Investigator of Merrill Lynch & Co., Inc. Fraud Unit (Mandel Decl. ¶__); (8) Declaration of Pauline C. Scalvino, Chief Compliance Officer for Vanguard Group, Inc. (Scalvino Decl. ¶__); and (9) Declaration of Kimberly Miller, Compliance Officer for Penson Financial Services, Inc. (Miller Decl. ¶__).  Some of the Declarations have been redacted to protect the confidentiality of certain personal customer information.

titled in the name of JSC Parex Bank, at Pinnacle Capital Markets, LLC. *Conroy Decl.* *¶16; Miller Decl. ¶5.*

Pinnacle Capital Markets, LLC ("Pinnacle") is a registered broker-dealer located in Raleigh, North Carolina. *Conroy Decl. ¶16; Miller Decl. ¶5.* Pinnacle maintains an omnibus brokerage account and seventy-five (75) sub-accounts, all titled in the name of Relief Defendant Parex Bank. *Conroy Decl. ¶16; Miller Decl. ¶5.* The most recent sub-account was opened in December 2006. *Conroy Decl. ¶16; Miller Decl. ¶5.* The proceeds of the Unknown Trader Defendants' ill-gotten gains are held in the Parex accounts. *Conroy Decl. ¶15.*

**B.    Evolution and Overview of the Online Intrusion Scheme**

The online brokerage account intrusion scheme is a combination of the traditional identity theft scam combined with the conventional "pump-and-dump" scheme, in which fraudsters manipulate the price of a stock through the dissemination of false or misleading statements to the marketplace. *Conroy Decl. ¶4.* In this new, high-tech iteration of the scheme, cyber criminals use the Internet to misappropriate the identification information and passwords of unwitting customers - - most likely through the use of "phishing" or keystroke logging programs - - and use the stolen information to intrude into and place unauthorized trades in unwitting customers' online accounts. *Conroy Decl. ¶4.* This unauthorized buying and selling creates the appearance of heightened trading activity and effectively drives up the price of the stocks. *Conroy Decl. ¶¶3-4*

The modern intrusion manipulation scheme has resulted in large losses to investors and the brokerage industry. *Id. ¶5.* Indeed, merely by virtue of the Unknown

Trader Defendants' actions here, the online broker-dealers whose customer accounts were compromised suffered losses in excess of $2 million in their efforts to make their customers whole. *Conroy Decl. ¶87.* This loss represents the cost to the broker-dealers of unwittingly providing the equity for the Unknown Trader Defendants to place unauthorized trades in the intruded accounts. *Id.* In addition, the Unknown Trader Defendants' manipulative trading has caused unquantifiable damage to market participants who purchased the stocks subject to the intrusions at the artificially inflated prices. *Id.* The instant action is the latest in a series of enforcement actions recently brought by the Commission in its ongoing effort to halt this rapidly-growing fraud.[3]

**C.    The Unknown Trader Defendants Trade Anonymously Through Accounts Titled in the Name of Relief Defendant Parex Bank**

Relief Defendant Parex opened an omnibus brokerage account at Pinnacle in June 2002 and has since opened a total of seventy-five (75) sub-accounts titled in Parex's corporate name. *Conroy Decl. ¶16; Miller Decl. ¶5.* The most recent sub-account was opened in December 2006. *Conroy Decl. ¶16; Miller Decl. ¶5.* According to the account opening documents, the sub-accounts shall not be considered separate accounts for any purpose except to separate securities into separate groups for the convenience of the customer to view the sub-accounts. *Miller Decl. ¶5.* In addition, there are a total of twenty (20) beneficial owners of the omnibus account, who are residents of Russia, Latvia, Lithuania or the British Virgin Islands. *Miller Decl. ¶6.* The documents do not identify the beneficial owners of the sub-accounts. *Miller Decl. ¶6.* Moreover, the

---

[3] *See, e.g., SEC v. Aleksey Kamardin,* Civil Action No. 8:07-CV-159-T24MAP (M.D. Fla. Jan. 25, 2007) (Defendant traded in seventeen companies that were subject to intrusions); *SEC v. Grand Logistic, S.A. et al.,* Civil Action No. 06-15274 (S.D.N.Y. Dec. 19, 2006) (asset freeze and preliminary injunction granted against Estonian brokerage firm that provided intruders access to U.S. exchanges). *See also* Speech by SEC Chairman Christopher Cox: Opening Remarks to the Practicing Law Institute's SEC Speaks Series (Feb. 9, 2007) (discussing recent account intrusion cases brought by Commission).

Corporate Account Agreement maintained by Penson that was executed on behalf of Parex lists the bank's president, vice president and chairman of the board as the sole individuals authorized to open accounts and trade in the account and sub-accounts. *Miller Decl.* ¶7. Parex appears to be routinely commingling funds among its omnibus account and its sub-accounts. *Conroy Decl.* ¶17.

Parex maintains a website with the domain name www.parex.lv and allows its customers to access their accounts online via that website by entering a username and password directly onto the website. *Conroy Decl.* ¶18. Once logged in, customers can access their Parex accounts and request that trades be places in the Parex accounts at Pinnacle for stocks and options traded via a number of foreign exchanges, including major U.S. exchanges and markets such as the New York Stock Exchange and the Nasdaq. *Conroy Decl.* ¶18. Parex charges its customers a commission for each trade executed in their accounts. *Conroy Decl.* ¶18.

### D.  Details of the Unknown Trader Defendants' Online Intrusion-Manipulation Scheme

Between December 21, 2005 and at least December 4, 2006, the Unknown Trader Defendants, using sub-accounts at Pinnacle titled in the name of Relief Defendant Parex, traded in at least fifteen companies whose share prices were manipulated through online intrusions and unauthorized trading in investors' accounts at E*Trade Securities, LLC ("E*Trade"), Scottrade, Inc. ("Scottrade"), TD Ameritrade, Inc. ("TD Ameritrade"), Vanguard Brokerage Services ("Vanguard"), Fidelity Investments ("Fidelity"), Merrill Lynch & Co., Inc. ("Merrill Lynch") and Charles Schwab & Co., Inc. ("Schwab"). *Conroy Decl.* ¶¶19-20. In each of these instances, the trading pattern was the same. First, the Unknown Trader Defendants accumulated in their accounts at Pinnacle a

position in a thinly traded company. *Conroy Decl.* ¶¶*3, 26-85.* Next, they intruded into

online accounts at various broker-dealers, liquidated existing positions and used the

resulting proceeds to purchase shares of the same thinly traded stocks they previously

purchased in their own accounts. *Conroy Decl.* ¶¶*3, 23.* In every instance, the IP

addresses used to intrude into the online accounts were different from the IP addresses

the accountholders had used to carry out their normal trading activity. *Id.* ¶¶*3, 21, 22.*

The unauthorized trading created the appearance of trading activity and drove up the

price of the stocks. *Id.* ¶¶*3.* Then, at the height of the price surge, the Unknown Trader

Defendants sold at the inflated prices the shares they previously bought in their own

accounts. *Id.* ¶¶*3, 13, 19, 26-85.* As a result of their fraudulent trading, the Defendants

realized profits totaling at least $732,941. *Conroy Decl.* ¶*86.*

    The following Nasdaq-quoted companies were subject to unauthorized intrusions

surrounding the time of the Unknown Trader Defendants' trading of the same stocks in

their Parex accounts: Remote Dynamics, Inc., DepoMed, Inc., Orchid Cellmark, Inc.,

Repligen Corp., Dura Automotive Systems, Inc., Valentis, Inc., WTS Dime Bankcorp,

Inc., Bluefly, Inc., Netwolves Corp., Netguru, Inc., Integrated Alarm Services Group,

Inc., I-Many, Inc., Tapestry Pharmaceuticals, Inc., Onvia, Inc. and BriteSmile, Inc.

*Conroy Decl.* ¶¶*7, 10.*

    A description of the Unknown Trader Defendants' trading in Dura Automotive

systems, Inc. accurately represents their overall scheme, the details of which are set forth

in the attached Appendix:

- <u>The Company</u>: Dura Automotive Systems, Inc. ("DRRA") is a

    Rochester Hills, Michigan entity purportedly engaged in the design and

manufacture of automobile industry systems. *Conroy Decl. 42.* Until

November 8, 2006, the company traded on the Nasdaq Global Market

under the ticker symbol DRRA. *Id.* On August 28, 2006, DRRA was the

subject of online intrusions at TD Ameritrade, Scottrade, E*Trade and

Schwab. *Id. ¶39.*

- The Buy-Up:  Prior to the intrusions, from August 15, 2006, until

August 28, 2006, the Unknown Trader Defendants accumulated in their

Parex accounts 355,500 shares of DRRA at prices ranging from $.39 to

$.45 per share. *Conroy Decl. ¶44.*

- The Intrusions:  On August 28, from 12:42 p.m. to 3:39 p.m., an

account at TD Ameritrade was intruded into and used to purchase and sell

363,500 shares of DRRA. *Heeney Decl. ¶30.*  That same day, between

11:41 a.m. and 12:41 p.m., four accounts at Scottrade were intruded into

and used to purchase 337,000 shares of DRRA. *Hough Decl. ¶¶63-74.*

Almost simultaneously, between 11:41 a.m. and 1:50 p.m., two E*Trade

accounts were intruded into and used to purchase 231,000 shares of

DRRA. *Autrey Decl. ¶¶10-15.*  Between 2:33 p.m. and 2:50 p.m., a

Schwab account was intruded into and used to purchase 30,000 shares of

DRRA. *Stewart Decl. ¶¶32-35.*  The intruders also attempted to purchase

another 25,000 shares in the account, but the orders were cancelled by

Schwab prior to execution. *Stewart Decl. ¶¶32-35.*

- Effect on the Market:  On August 28, 2006, DRRA opened at $.54 per

share and increased to an intra-day high of $.66 per share on volume of

4,759,599 shares, compared to its prior 15-day historical average trading volume of 495,289 shares. *Conroy Decl. ¶43.*

- The Sell-Off: Concurrently with the intrusions, on August 28, 2006, between 1:06 p.m. and 2:33 p.m., the Unknown Trader Defendants sold their 355,500 DRRA shares held in their Parex accounts at prices ranging from $.58 to $.61 per share, realizing a profit of approximately $51,511. *Conroy Decl. ¶45.*

### E.     The Unknown Trader Defendants Further Masked Their Identities By Intruding Into the Accounts Through Hijacked Computers

In addition to concealing their identities by trading anonymously through Relief Defendant Parex's accounts, the Unknown Trader Defendants further masked their identities by intruding into the accounts through hijacked computers. *Conroy Decl. ¶¶21, 22.* As such, the IP addresses used to intrude into the accounts trace back to innocent third parties whose computers appear to have been infiltrated to effectuate the intrusions.

Nevertheless, the timing of the intrusions involving a total of fifteen separate issuers and the unauthorized trading of these thinly traded companies in the compromised accounts, coupled with the coinciding trading pattern and consistent profits realized repeatedly in the Parex accounts, compel the conclusion that certain individuals trading anonymously through the Parex accounts are deliberately perpetrating this fraudulent scheme. *Conroy Decl. ¶23.*

## IV.  LEGAL ANALYSIS

### A.  This Motion Satisfies the Special Standard Applicable to Requests by the Commission for a Temporary Restraining Order and Preliminary Injunction

Section 21(d) of the Exchange Act sets forth the standard for issuing an injunction sought by the Commission:

> Whenever it shall appear to the Commission that any person is engaged, or is about to engage, in acts or practices constituting a violation of any provision of this title, . . . it may . . . bring an action . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d).

The Commission's burden when seeking an injunction thus is lower than that of a a private party. This is true because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safe-guarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir. 1975). Thus, "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." *SEC v. Stratton Oakmont, Inc.*, 878 F. Supp. 250, 255 (D.D.C. 1995) (quoting *Hecht Company v. Bowles*, 321 U.S. 321, 331 (1944)). In particular, the Commission need not show risk of irreparable injury or the unavailability of remedies at law. *See Stratton Oakmont*, 878 F. Supp. at 255 (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990)).

Instead, the Commission must make out a "strong prima facie case of previous violations" and show a reasonable likelihood that the wrong will be repeated. *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994); *SEC v. Life Partners, Inc.*, 898 F. Supp. 14,

18 (D.D.C. 1995) (citing *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991)).  As set forth herein, the Commission has more than met its burden.

> 1.    **The Commission is Substantially Likely to Succeed in Establishing that the Unknown Trader Defendants Have Violated the Antifraud Provisions of the Exchange Act and the Securities Act**

The Commission has alleged in its Complaint violations of the antifraud provisions of the Exchange Act and the Securities Act.  There is a substantial likelihood that the Commission will succeed in establishing each of these violations.

Section 17(a) of the Securities Act prohibits the employment of fraudulent devices in the offer or sale of any security, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the employment of fraudulent devices in connection with the offer, purchase, or sale of securities.  More specifically, Section 17(a)(1) provides that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud."  Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  Rule 10b-5 (a) and (c), in turn, prohibit, respectively, "employ[ing] any device, scheme or artifice to defraud" and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  The Supreme Court has recognized that the antifraud provisions of the Securities Act and the Exchange Act prohibit essentially the same conduct.  *See United States v. Naftalin*, 441 U.S. 768, 778 (1979).

These provisions do not require a material misrepresentation or omission, but rather, contain "flat prohibitions of deceitful practices." *SEC v. Graystone Nash, Inc.*, 820 F. Supp. 863, 871 (D.N.J. 1993), *rev'd on other grounds*, 25 F.3d 187 (1994); *see also United States v. Charnay*, 537 F.2d 341, 351 (9th Cir. 1976) (clauses (a) and (c) of Rule 10b-5 "make no reference to a requirement that defendants . . . must fail to disclose material facts for their conduct to be proscribed"); *SEC v. Santos*, 355 F. Supp. 2d 917, 919 (N.D. Ill. 2003) (allegations that defendants participated in a scheme to defraud satisfies the plain language of Rule 10b-5(a) and (c)).

Stock market manipulation falls squarely within these prohibitions against deceitful practices. *SEC v. U.S. Environmental, Inc., et al.*, 82 F. Supp.2d 237 (S.D.N.Y. 2000). As defined by the Supreme Court, market manipulation is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). Moreover, "the gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

In order to prove a claim of market manipulation, the Commission must show that the Unknown Trader Defendants engaged in "conduct designed to deceive or to defraud investors," using the instrumentalities of interstate commerce and acting with scienter. *Dirks v. SEC*, 463 U.S. 646, 664 n.23 (1983). For the conduct to be reached under Section 10(b) and Rule 10b-5, defendant's conduct must be connected to the purchase or sale of securities. For the conduct to be reached under Section 17(a), the defendant's

- 12 -

conduct must be in the offer or sale of securities. *See Graham v. SEC*, 222 F.3d 994, 1002 (D.C. Cir. 2000).

### a. The Unknown Trader Defendants' Fraudulent Conduct is in the Purchase and Sale of Securities

Here, the Unknown Trader Defendants' fraudulent conduct clearly is in the purchase and sale of securities. To generate unlawful trading profits, the Unknown Trader Defendants, using accounts titled in the name of Relief Defendant Parex, bought inexpensive and thinly traded stocks at market prices. Then, the Unknown Trader Defendants, or others working with them, intruded into the online brokerage accounts of innocent third parties using hijacked computers to conceal their identities, liquidated the securities held by those unwitting accountholders, and purchased the same thinly traded stocks at prices artificially inflated by the unauthorized orders. As the price escalated, the Unknown Trader Defendants sold their holdings of these securities held in their accounts for a significant profit.

In *SEC v. Zandford*, 535 U.S. 813, 822 (2002), the Supreme Court stated that the "in connection" requirement under Section 10(b) is met if the scheme to defraud and the sale of securities coincide. In this case, the Unknown Trader Defendants' account intrusion scheme not only coincided with the purchase and sale of securities, but the scheme was employed solely for the purpose of trading in securities. As novel as the Unknown Trader Defendants' scheme may appear to be, the account intrusion scheme simply is a high-tech version of the traditional "pump and dump" stock manipulation scheme. Here, the Unknown Trader Defendants manipulated the prices of securities by pumping the value of those stocks through illegal online intrusions in advance of "dumping" their own shares they had previously purchased at lower prices.

The Court's reasoning in *Zandford* defining the scope of Section 10(b) and Rule 10b-5 is equally applicable to the Commission's Section 17(a) claims. Section 17(a) of the Securities Act prohibits fraudulent schemes, misrepresentations, or activities that operate as a fraud upon any person "in the offer or sale" of any security. The term "in the offer or sale" is not narrower than "in connection with." *United States v. Naftalin*, 441 U.S. 768, 772, and ftn. 4 (1979).[4] A fraud to be included within the proscription of Section 17(a) need only "somehow touch[] upon" or have "some nexus" with a securities. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).

In this day and age, when computer hackers present an ever-present threat to the security of personal information and the financial markets, Sections 17(a) and 10(b) surely extend to the Unknown Trader Defendants' conduct. As the Supreme Court stated in *Superintendent of Insurance v. Bankers Life & Casualty Co.*: "10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." 404 U.S. 6, 11 (1971) (*quoting A.T. Brod. & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967) (emphasis in original). Here, the Unknown Trader Defendants' scheme is designed specifically to take advantage of the financial marketplace, notwithstanding the fact that the scheme may appear to be "novel" or "atypical."

---

[4] This view is bolstered by the independent history of Section 17(a). The phrase "in the offer or sale" is construed broadly and includes the entire selling process. *United States v. Naftalin*, 441 U.S. at 775; *Graham v. SEC*, 222 F.3d 994, 1002 (D.C.Cir 2000). The term "in the offer or sale" has been used interchangeable by both Congress and the Supreme Court. *Naftalin*, 441 U.S. at 772 n. 4.

**b. The Unknown Trader Defendants Acted with Scienter in Perpetrating Their Fraudulent Scheme**

Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. at 193. The law does not require direct evidence of scienter, rather "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n.30 (1983). This is true even in criminal cases. *United States v. Rhodes*, 886 F.2d 375, 381 (D.C. Cir. 1989) ("fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations"); *see also SEC v. First City Financial Corp., Ltd.,*, 890 F.2d 1215, 1223 (D.C. Cir. 1989) (circumstantial evidence of intent is "no less probative or forceful" than direct evidence).

Here, the Unknown Trader Defendants are intentionally conducting a sophisticated fraudulent scheme involving multiple market manipulations. Based on the overwhelming circumstantial evidence, there simply is no possible innocent explanation for the pattern and timing of their trades, and the way in which the trades match up to the unauthorized trades in the intruded accounts. Over and over, the Unknown Trader Defendants' trades always win and the intruded accountholders invariably lose. Moreover, given the nature of the securities traded by the Unknown Trader Defendants, their scheme to date has resulted in relatively exorbitant profits in a short period of time. These facts provide more than ample circumstantial evidence that the Unknown Trader Defendants are conducting this intrusion scheme. *SEC v. U.S. Environmental, Inc.*, 82 F. Supp.2d 237, 240-41.

- 15 -

Courts frequently will allow a plaintiff to rely upon circumstantial evidence to establish violations of the securities laws and a defendant's scienter, particularly where, as here, direct proof of wrongdoing may be difficult to obtain. *See, e.g., Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996); *Zweig v. Hearst Corp.*, 594 F.2d at 1266-69. "The proof of violations and scienter required in [securities] fraud cases is often a matter of inference from circumstantial evidence…[W]e have noted elsewhere that circumstantial evidence can be more than sufficient." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 n.30 (1983). Indeed, in similar cases involving insider trading, circumstantial evidence has been relied upon to establish violations of the federal securities laws. *See, e.g., United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) ("opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of insider trading"); *SEC v. Warde*, 151 F.3d 42, 48 (2d Cir. 1998) (parallel trading of defendant and another supports inference that inside information was disclosed to defendant); *SEC v. Singer*, 786 F. Supp. 1158, 1161-65 (S.D.N.Y. 1992) ("circumstantial evidence, such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity occurred"). As the Supreme Court emphasized in *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960), circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.

2.    **There is a Reasonable Likelihood That the Unknown Trader Defendants' Wrongdoing Will Be Repeated**

The second prong of the test for issuing a temporary restraining order - that a reasonable likelihood exists that the wrong will be repeated unless enjoined - also is satisfied here.  The Unknown Trader Defendants' pattern of intrusions and trading is ongoing and, based on the latest information available to the Commission, last repeated itself as recently as December 4, 2006.[5]  Given the Unknown Trader Defendants' repeated and frequent conduct since December 2005 , there is a high probability that the Unknown Trader Defendants will continue to violate the federal securities laws unless restrained and enjoined.  Further, absent injunctive relief, nothing would prevent the Unknown Trader Defendants from either continuing or re-commencing their conduct in other trading accounts.

As the Second Circuit made clear in *Management Dynamics, Inc.*:

> [T]he commission of past illegal conduct is highly suggestive of the likelihood of future violations . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant . . . Moreover, the appellate courts have repeatedly cautioned that cessation of illegal activity does not *ipso facto* justify the denial of an injunction.

515 F.2d at 807.  In assessing the likelihood of repetition, courts also look to such factors as the character of the violation and the degree of scienter involved.  *See, e.g., SEC v. Cavanagh*, 155 F.3d , 129, 135 (2d Cir. 1998); *SEC v. Commonwealth Chemical*

---

[5]    Although the information the Staff has been able to obtain to date has been limited to intrusions involving these fifteen stocks, the trade blotters provided by Penson reveal other suspicious trading by the Parex sub-accounts involving additional stocks that fit the pattern of trading in the Parex sub-accounts with respect to the fifteen intruded issuers.  *Conroy Decl. ¶23.* The Staff has not yet tied these additional trades to specific instances of intrusions.  *Id.* Nevertheless, it is highly possible that it will uncover evidence of additional intrusions which could further implicate the Parex accounts and result in even greater ill-gotten profits.  *Id.*

*Securities, Inc.*, 574 F.2d 90, 100-01 (2d Cir. 1978); *SEC v. Musella*, 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

As discussed above, the Unknown Trader Defendants' conduct is egregious, deliberate, repetitive and highly deceptive. Given the sophisticated nature of this online scheme and the Unknown Trader Defendants' technological capabilities, there is every reason to believe that, unless enjoined, they will continue their highly profitable unlawful conduct. Therefore, a temporary restraining order and preliminary injunction are warranted to preserve the status quo pending the adjudication of the merits of the Commission's Complaint.

### B.    The Court Should Issue an Order Freezing the Assets Held In Relief Defendant Parex's Brokerage Accounts at Pinnacle

A freeze of Relief Defendant Parex's accounts is necessary to preserve the ill-gotten funds realized by the Unknown Trader Defendants that may be necessary to satisfy any order of disgorgement, statutory civil penalty, or other relief that may ultimately be imposed by the Court. *Unifund SAL*, 910 F.2d at 1041-42. Indeed, an order for disgorgement or other final monetary relief will often be rendered meaningless without an asset freeze during the pendency of the action. *See, e.g., SEC v. Vaskevitch*, 657 F. Supp. 312, 315 (S.D.N.Y. 1987). Moreover, to obtain an asset freeze, the Commission need only show that it is likely to succeed on the merits of the case. *Cavanagh*, 155 F.3d at 132.

Courts frequently have granted orders freezing assets in similar cases where, as here, there was a concern that the defendant might dissipate assets or transfer assets beyond the court's jurisdiction. *See, e.g., SEC v. United Communications, Ltd.*, 899 F. Supp. 9, 11-12 (D.D.C. 1995); *SEC v. Current Financial Servs., Inc.*, 798 F. Supp. 802,

809 (D.D.C. 1992); *SEC v. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991). Moreover, once personal jurisdiction over a party is obtained, it is appropriate to enter a freeze order against that party to prevent the transfer of assets under its control, within or outside the United States. *Id.* at 384. Thus, an order freezing assets may also properly be directed to others who allegedly hold funds on behalf of the defendant. *United States v. First Nat'l City Bank*, 379 U.S. 378 (1965).

It is well settled that where there are concerns that the defendant might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. *Unifund SAL*, 910 F.2d at 1041. Here, this standard is more than met. There is a substantial danger that the Unknown Trader Defendants, through Parex, are likely to remove assets beyond the jurisdiction of this Court. Relief Defendant Parex is a foreign entity domiciled outside the United States that already has transferred at least $2 million to an offshore account located outside this Court's jurisdiction. Under the circumstances, a freeze on the portion of Parex's accounts representing the Unknown Trader Defendants' ill-gotten gains, plus penalties and prejudgment interest, is warranted and should be ordered by the Court.[6] Moreover, a freeze will merely preserve the status quo, pending the Court's adjudication of the Commission's Complaint.

---

[6] Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)] set the standards for imposition of civil money penalties. These two statutes are virtually identical and establish three tiers of penalties. Under the third tier, the Court may impose a penalty not to exceed the greater of (i) $120,000 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. *See* 15 U.S.C. § 78u(d)(3) and 15 U.S.C. § 77t(d). The third tier applies where the conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. The purpose of a civil penalty is to punish the individual violator and deter future violations; any civil penalty is to be determined by the Court in light of

**C.    The Court Should Order Expedited Discovery**
**and the Preservation of Documents**

The Commission has filed this action expeditiously and prompt resolution of the action is critical to prevent further securities violations and protect investors. To achieve a prompt resolution, the Commission requests that expedited discovery be permitted in the manner described in the Commission's proposed order. Expedited discovery often is granted in cases where emergency relief is sought. *See, e.g., Lincoln Hockey Ltd. Liability Co. v. Semin*, No. Civ.A.05-02094 (HHK), 2005 WL 3294008, at *2 (D.D.C., Dec. 5, 2005); *United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 179 (D.D.C. 2001). Given that the parties must prepare expeditiously for an evidentiary hearing on the question of whether this Court should enter a preliminary injunction, expedited discovery is appropriate.

In addition, to protect the documents necessary to establish a complete record in this matter, the Commission also seeks an order preventing the alteration or destruction of documents. Good faith preservation of documents cannot be assumed in the context of a fraudulent scheme. Accordingly, orders preventing the alteration or destruction of documents are routinely granted to protect the integrity of the litigation. *See, e.g., SEC v. Unifund SAL*, 910 F.2d at 1040 n.11; *SEC v. Interlink Data Network of Los Angeles*, Civ. No. 93-3073R, 1993 WL 603274, at *14 (C.D. Cal., Nov. 15, 1993); *SEC v. Sterns*, No. CV91-1303, 1991 WL 204901 (C.D. Cal. Apr. 25, 1991).

---

the facts and circumstances of the case. *SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 17 (D.D.C. 1998). Here, the amount of profits earned on the illegal trades in the Parex accounts plus the costs incurred by the intruded account holders' broker-dealers because of the Unknown Trader Defendants' intrusions is $2,732,942.00. *Conway Decl.* ¶¶ 86-87. Therefore, an appropriate civil money penalty may be as great as that amount. Accordingly, a freeze order of twice that amount, or $5,465,884, is appropriate in these circumstances.

**D.**    <u>**The Court Should Order Relief Defendant Parex to Repatriate Funds**</u>

The Commission also respectfully asks the Court to issue an order requiring Parex to repatriate any proceeds of the fraud previously transferred from its omnibus brokerage account at Pinnacle to any foreign jurisdictions.  The authority to order repatriation of funds held abroad emanates from the Court's long-standing authority "to make effective the right of recovery" afforded by the federal securities laws.  *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288 (1940).  Such relief in conjunction with an asset freeze will protect the funds from dissipation and is appropriate where, as here, the defendants already have transferred proceeds outside the jurisdiction of the United States.  *See SEC v. Bankers Alliance Corp.*, Civ. No. 95-0428 (PLF), 1995 WL 590665, at *18 (D.D.C. May 5, 1995); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985); *Inter-Regional Financial Group, Inc. v. Hashemi*, 562 F.2d 152, 154 (2d Cir. 1977), *cert. denied*, 434 U.S. 1046 (1978); *see also SEC v. Lohmus Haavel & Viiseman*, 05 Civ. 9259 (RWS), 2005 WL 3309748, at *2-3 (S.D.N.Y. Nov. 8, 2006).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Commission respectfully requests that the Court

issue the Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets

and Granting Other Relief in the form of order submitted with the accompanying motion.


Respectfully submitted,


DATED:  March 6, 2007

Kenneth Guido, Trial Counsel (Bar No. 151605)
John Reed Stark
Thomas A. Sporkin
N. Blair Vietmeyer
Sarit Klein
David Smyth
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, DC 20549
(202) 551-4892 (Stark)
(202) 772-9278 (Fax)
Email: starkj@sec.gov

**APPENDIX**

**Remote Dynamics, Inc.**

- <u>The Company</u>:  Remote Dynamics, Inc. is a Richardson, Texas-based purported developer and owner of mobile resource management technologies. *Conroy Decl. ¶26.*  Until February 21, 2006, the company traded on the Nasdaq Capital Market under the ticker symbol REDI.  *Id.*  On February 9, 2006, REDI was the subject of online intrusions at TD Ameritrade, Scottrade and E*Trade.  *Id.*

- <u>The Buy-Up</u>:  In the days leading up to the intrusions, from February 3, 2006 until February 8, 2006, the Unknown Trader Defendants accumulated in their own accounts 580,240 shares of REDI at prices ranging from $.24 to $.29 per share, and sold 68,040 shares at $.23 to $.25 per share.  *Conroy Decl. ¶28.*

- <u>The Intrusions</u>:  On February 9, 2006, from 12:29 p.m. to 12:51 p.m., one or more of the Defendants intruded into an account at TD Ameritrade and placed orders to buy 243,900 shares of REDI.[1]  *Heeney Decl. ¶¶56-57.*  Similarly, from 12:22 p.m. to 1:21 p.m., the Defendants intruded into two Scottrade accounts and purchased a total of 241,000 shares of REDI.  *Hough Decl. ¶¶24-29.*  Also on February 9, from 1:35 p.m. to 2:05 p.m., one or more of the Defendants intruded into an E*Trade account and placed orders to purchase 215,000 shares of REDI.  *Autrey Decl. ¶¶49-51.*  At 2:08 p.m., the intruders placed an order to sell these 215,000 shares at market prices.  *Id. ¶49.*

- <u>Effect on the Market</u>:  On February 9, 2006, REDI opened at $.29 per share and increased to an intra-day and 52-week high of $1.10 per share on volume of

---

[1]  All times set forth herein are in Eastern Time Zone.

3,943,257 shares compared to its prior 15-day historical average trading volume of 132,882 shares. *Conroy Decl. ¶27.*

- .The Sell-Off: Concurrently with the Intrusions, on February 9, 2006, between 2:38 p.m. and 3:06 p.m., the Unknown Traders sold their 512,200 REDI shares in their own accounts, as well an additional 9,800 shares they previously purchased in their accounts, at prices ranging from $.36 to $.54 per share, realizing a profit of at least $75,720. *Conroy Decl. ¶29.*

### DepoMed, Inc.

- The Company: DepoMed, Inc. is a Menlo Park, California-based company that purports to develop proprietary oral drug delivery technologies. The company trades on the Nasdaq Global Market under the symbol DEPO. On December 4, 2006, REDI was the subject of online intrusions at TD Ameritrade, Scottrade, Fidelity and Schwab. *Conroy Decl. ¶30.*

- The Buy-Up: Prior to the intrusions, on December 1, 2006, the Unknown Traders bought in their own accounts 389,461 shares of DEPO at prices ranging from $3.35 to $3.75 per share, and sold 2,739 shares at $3.37 to $3.41 per share. *Conroy Decl. ¶32.*

- The Intrusions: On December 4, 2006, between 1:27 p.m. and 2:21 p.m., one or more of the Defendants intruded into five accounts at TD Ameritrade and purchased a total of 246,600 shares of DEPO stock. During this period, the intruders also sold 119,400 shares of DEPO in two of the accounts. *Heeney Decl. ¶¶9-18.* Similarly, from 1:27 p.m. to 1:57

p.m. on December 4, the Defendants intruded into two Scottrade accounts and purchased 7,050 shares of DEPO. *Hough Decl.* ¶¶*86-90*. Between 1:27 p.m. and 2:20 p.m., the Defendants intruded into four accounts at Fidelity, purchased 59,200 shares in two of the accounts and attempted to purchase another 11,000 shares in the other two accounts. *Moore Decl.* ¶¶*8-14*. Finally, between 1:27 p.m. and 2:19 p.m., the Defendants intruded into five accounts at Schwab and purchased 163,100 shares of DEPO. The intruders also attempted to purchase another 34,500 shares in the accounts but the orders were cancelled by Schwab prior to execution. *Stewart Decl.* ¶¶*8-17*.

- <u>Effect on the Market</u>: On December 4, 2006, DEPO opened at $3.62 per share and increased to an intra-day high of $3.79 per share on volume of 2,356,336 shares, compared to its prior 15-day historical average trading volume of 347,627 shares. *Conroy Decl.* ¶*31*.

- <u>The Sell-Off</u>: At the height of the price surge, on December 4, 2006, between 1:40 p.m. and 2:44 p.m., the Unknown Traders sold 251,254 shares of DEPO in their own accounts at prices ranging from $3.17 per share to $3.99 per share, realizing profits of at least $51,078. *Conroy Decl.* ¶*33*.

**Orchid Cellmark, Inc.**

- <u>The Company</u>: Orchid Cellmark, Inc. is a Princeton, New Jersey based company that purports to offer human and agricultural DNA testing services. The company trades on the Nasdaq Global Market under the

symbol ORCH.  On November 15, 2006, ORCH was the subject of online

intrusions at TD Ameritrade, Scottrade and Schwab.  *Conroy Decl. ¶34.*

- The Buy-Up:  Prior to the intrusions, on November 14, 2006, the

  Unknown Traders bought 157,466 shares of ORCH in their own accounts

  at prices ranging from $3.25 to $3.70 per share.  *Conroy Decl. ¶36.*

- The Intrusions:  On November 15, 2006, between 11:01 a.m. and 12:17

  p.m., one or more of the Defendants intruded into an account at Schwab

  and purchased 171,000 shares of ORCH.  *Stewart Decl. ¶¶18-20.*  Also on

  November 15, from 11:07 a.m. to 12:02 p.m., the Defendants intruded into

  two accounts at TD Ameritrade and purchased 12,500 shares of ORCH.

  *Heeney Decl. ¶¶20-24.*  From 11:02 a.m. until 12:35 p.m., the Defendants

  intruded into two accounts at Scottrade and purchased 5,000 shares of

  ORCH.  *Hough Decl. ¶¶81-85.*

- Effect on the Market:  On November 15, 2006, ORCH opened at $3.65 per

  share and climbed to an intra-day high of $4.08 per share on volume of

  1,153,767 shares, compared to its prior 15-day historical average of

  138,179 shares.  *Conroy Decl. ¶35.*

- The Sell-Off:  During the intrusions, on November 15, between 12:10 p.m.

  and 1:52 p.m., the Unknown Traders sold all 157,466 of their ORCH

  shares in their own accounts at prices ranging from $3.51 to $4.06 per

  share, realizing a profit of approximately $55,783.  *Conroy Decl. ¶37.*

**Repligen Corp.**

- <u>The Company</u>: Repligen Corp. is a Waltham, Massachusetts entity that
  purports to develop new drugs for autism, organ transplantation and
  cancer. The company trades on the Nasdaq Global Market under the
  symbol RGEN. On October 2, 2006, RGEN was the subject of online
  intrusions at TD Ameritrade, Scottrade, E*Trade, Fidelity and Schwab.
  *Conroy Decl. ¶38.*

- <u>The Buy-Up</u>: Prior to the intrusions, from September 28, 2006, to October
  2, 2006, the Unknown Traders purchased in their own accounts 41,720
  shares of RGEN at prices ranging from $3.05 to $3.24 per share. *Conroy
  Decl. ¶40.*

- <u>The Intrusions</u>: On October 2, 2006, between 11:52 a.m. and 12:28 p.m.,
  one or more of the Defendants intruded into two accounts at TD
  Ameritrade and bought 207,500 shares of RGEN. *Heeney Decl. ¶¶25-29.*
  From 11:55 a.m. to 12:45 p.m., the Defendants intruded into an account at
  E*Trade and placed orders to buy 12,800 shares of RGEN. *Autrey Decl.
  ¶¶7-9.* Similarly, at 11:52 a.m., the Defendants intruded into a Scottrade
  account and purchased 2,000 shares of RGEN. *Hough Decl. ¶¶75-77.*
  Moments later, 11:59 a.m., one or more of the Defendants intruded into an
  account at Fidelity and purchased 2,000 shares. *Moore Decl. ¶¶15-17.*
  Likewise, between 11:52 a.m. and 12:37 p.m., one of more of the
  Defendants intruded into three accounts at Schwab and bought 124,500
  RGEN shares. The intruders also attempted to purchase an additional

108,000 shares in the accounts, but the orders were cancelled by Schwab prior to execution. *Stewart Decl. ¶¶25-31.*

- Effect on the Market:  On October 2, 2006, RGEN opened at $3.40 per share and increased to an intra-day high of $4.17 per share on volume of 1,264,748 shares, compared to its prior 15-day historical average trading volume of 52,456 shares. *Conroy Decl. ¶39.*

- The Sell-Off:  Concurrently with the intrusions, on October 2, 2006, between 1:05 p.m. and 1:50 p.m., the Unknown Traders sold in their own accounts all 41,720 of their RGEN shares at prices ranging from $3.65 to $4.00 per share, realizing a profit of approximately $28,057. *Conroy Decl. ¶41.*

### Dura Automotive Systems, Inc.

- The Company:  Dura Automotive Systems, Inc. is a Rochester Hills, Michigan entity purportedly engaged in the design and manufacture of automobile industry systems.  Until November 8, 2006, the company traded on the Nasdaq Global Market under the symbol DRRA.  On August 28, 2006, DRRA was the subject of online intrusions at TD Ameritrade, Scottrade, E*Trade and Schwab. *Conroy Decl. ¶42.*

- The Buy-Up:  Prior to the intrusions, from August 15, 2006 until August 28, 2006, the Unknown Traders accumulated in their own accounts 355,500 shares of DRRA at prices ranging from $.39 to $.45 per share. *Conroy Decl. ¶44.*

- <u>The Intrusions</u>:  On August 28, from 12:42 p.m. to 3:39 p.m., one or more of the Defendants intruded into an account at TD Ameritrade, purchased 363,500 shares of DRRA, and sold 363,500 shares.  *Heeney Decl.  ¶¶30-32*.  That same day, between 11:41 a.m. until 12:41 p.m., the Defendants intruded into four accounts at Scottrade and purchased 337,000 shares of DRRA.  *Hough Decl.  ¶¶63-74*.  Almost simultaneously, between 11:41 a.m. and 1:50 p.m., one of more of the Defendants intruded into two E\*Trade accounts and purchased 231,000 shares of DRRA.  *Autrey Decl.  ¶¶10-15*.  Between 2:33 p.m. and 2:50 p.m., the Defendants intruded into a Schwab account and purchased 30,000 shares of DRRA.  They also attempted to purchase another 25,000 shares in the account, but those orders were cancelled by Schwab prior to execution.  *Stewart Decl.  ¶¶ 32-35*.

- <u>Effect on the Market</u>:  On August 28, 2006, DRRA opened at $.54 per share and increased to an intra-day high of $.66 per share on volume of 4,759,599 shares, compared to its prior 15-day historical average trading volume of 495,289 shares.  *Conroy Decl.  ¶43*.

- <u>The Sell-Off</u>:  During the intrusions, on August 28, 2006, between 1:06 p.m. and 2:33 p.m., the Unknown Traders sold their 355,500 DRRA shares in their own accounts at prices ranging from $.58 to $.61 per share, realizing a profit of approximately $51,511.  *Conroy Decl.  ¶45*.

**Valentis, Inc.**

- The Company:  Valentis, Inc. is a Burlingame, California-based purported biotechnology company trading on the Nasdaq Capital Market under the symbol VLTS.  On July 28, 2006, VLTS was the subject of unauthorized intrusions at Scottrade, TD Ameritrade, E*Trade and Schwab.  *Conroy Decl. ¶46.*

- The Buy-Up:  Prior to the intrusions, between July 25, 2006 and July 27, 2006, the Unknown Traders accumulated in their own accounts 446,767 shares of VLTS at prices ranging from $.34 to $.44 per share, and sold 3,267 shares at $.35 to $.40 per share.  *Conroy Decl. ¶48.*

- The Intrusions:  On July 28, between 9:58 a.m. and 1:01 p.m., one of more of the Defendants intruded into a TD Ameritrade account and purchased 696,999 shares of VLTS.  *Heeney Decl. ¶¶33-35.*  Between 11:28 a.m. and 11:55 a.m., the Defendants intruded into an account at Scottrade and purchased 53,500 shares of VLTS.  *Hough Decl. ¶¶60-62.*  Also on July 28, from 11:41 a.m. to 1:04 p.m., the Defendants intruded into two accounts at E*Trade and purchased 240,699 shares of VLTS.  *Autrey Decl. ¶¶16-21.*  Finally, between 12:13 p.m. and 12:17 p.m., one of more of the Defendants intruded into an account at Schwab and purchased 35,000 shares of VLTS.  *Stewart Decl. ¶¶36-38.*

- Effect on the Market:    On July 28, 2006, VLTS opened at $.65 per share and increased to an intra-day high of $.67 per share on volume of

3,723,383 shares, compared to its prior 15-day historical average trading volume of 1,704,102 shares. *Conroy Decl. ¶47.*

- <u>The Sell-Off</u>:  Contemporaneously with the intrusions, on July 28, 2006, between 11:03 a.m. and 11:05 a.m., the Unknown Traders bought an additional 210 shares of VLTS in their own accounts at $.61 to $.63 per share and, beginning at 12:43 p.m., sold all 443,920 of their VLTS shares at prices ranging from $.53 to $.67 per share, realizing a profit of at least $92,541. *Conroy Decl. ¶49.*

### WTS Dime Bancorp, Inc.

- <u>The Company</u>:  WTS Dime Bancorp, Inc. is a bankrupt New York based company whose shares trade as litigation tracking warrants.  The company trades on the Nasdaq Global Market under the symbol DIMEZ.  On July 6, 2006, DIMEZ was the subject of unauthorized intrusions at Scottrade and Vanguard. *Conroy Decl. ¶50.*

- <u>The Buy-Up</u>:  Prior to the intrusions, between June 21, 2006 and July 6, 2006 at 12:29 p.m., the Unknown Traders accumulated 897,000 shares of DIMEZ in their own accounts at prices ranging from $.16 to $.29 per share, and sold 5,500 shares at $.21 to $.28 per share. *Conroy Decl. ¶52.*

- <u>The Intrusions</u>:  On July 6, between 11:57 a.m. and 12:46 p.m., one of more of the Defendants intruded into two accounts at Scottrade and purchased 946,500 shares of DIMEZ. *Hough Decl. ¶¶54-59.*  Also on July 6, between 11:35 a.m. and 1:40 p.m., one of more of the Defendants intruded into a Vanguard account and purchased 2,802,838 shares of DIMEZ. *Scalvino Decl. ¶¶8-11.*

- **Effect on the Market**: On July 6, 2006, DIMEZ opened at $.25 per share and increased to an intra-day high of $.30 per share on volume of 14,791,078 shares, compared to its prior 15-day historical average trading volume of 292,982 shares. *Conroy Decl. ¶51.*

- **The Sell-Off**: Contemporaneously with the intrusions, on July 6, 2006, beginning at 1:11 p.m., the Unknown Traders sold in their own accounts their remaining 891,500 shares of DIMEZ at prices ranging from $.17 to $.30 per share, realizing a profit of approximately $60,378. *Conroy Decl. ¶53.*

### Bluefly, Inc.

- **The Company**: Bluefly, Inc. purports to be a New York-based Internet retailer of apparel, accessories and home furnishings. The company trades on the Nasdaq Capital Market under the symbol BFLY. On May 17, 2006, VLTS was the subject of unauthorized intrusions at E*Trade. *Conroy Decl. ¶54.*

- **The Buy-Up**: On May 17, 2006, between 2:41 p.m. and 3:02 p.m., the Unknown Traders purchased in their own accounts 121,000 shares of BFLY at prices ranging from $.81 to $.99 per share. *Conroy Decl. ¶56.*

- **The Intrusions**: Simultaneously with their purchases, on May 17, 2006, between 1:37 p.m. and 2:36 p.m., one or more of the Defendants intruded into an E*Trade account and purchased 132,680 shares of BFLY. *Autrey Decl. ¶¶25-27.*

- **Effect on the Market**: On May 17, 2006, BFLY opened at $0.72 per share and rose to a high of $1.01 per share on volume of 1,535,886 shares, compared to its prior 15-day historical average trading volume of 204,771 shares. *Conroy Decl. ¶55.*

- <u>The Sell-Off</u>:  Then, after the intrusions began, and at the height of the resulting price surge on May 17, 2006, between 3:28 p.m. and 3:36 p.m., the Unknown Traders sold their 121,000 BFLY shares in their own accounts at prices ranging from $.97 to $.99 per share, realizing a profit of approximately $6,843. *Conroy Decl. ¶57.*

### NetWolves Corp.

- <u>The Company</u>:  NetWolves Corp. is a Tampa, Florida-based company that purports to produce software and hardware technologies.  Until May 16, 2006, the company traded on the Nasdaq Capital Market under the symbol WOLV.  On April 13, 2006, WOLV was the subject of online intrusions at E*Trade, Scottrade and Fidelity. *Conroy Decl. ¶58.*

- <u>The Buy-Up</u>:  Prior to the intrusions, from March 28, 2006 until April 13, 2006 at 12:22 p.m., the Unknown Traders accumulated in their own accounts 909,700 shares in WOLV at prices ranging from $.27 to $.38 per share. *Conroy Decl. ¶60.*

- <u>The Intrusions</u>:  On April 13, between 12:19 p.m. and 2:33 p.m., one or more of the Defendants intruded into seven accounts at E*Trade and purchased 1,267,130 shares of WOLV. *Autrey Decl. ¶¶28-48.*  From 12:26 pm. until 1:10 p.m., the Defendants intruded into two accounts at Scottrade and purchased a total of 55,300 shares of WOLV. *Hough Decl. ¶¶48-53.*  In addition, between 12:28 p.m. and 12:58 p.m., one or more of the Defendants intruded into a Fidelity account and purchased 350,300 shares of WOLV. *Moore Decl. ¶¶18-21.*

- <u>Effect on the Market</u>:  On April 13, 2006, WOLV opened at $.35 per share and increased to an intra-day and 52-week high of $.49 per share on volume of

5,703,476 shares, compared to its 15-day average trading volume of 371,619

shares. *Conroy Decl. ¶59.*

- The Sell-Off:   Contemporaneously with the intrusions, on April 13, 2006,

  between 10:58 a.m. and 1:22 p.m., the Unknown Traders bought an additional

  800 shares of WOLV in their own accounts at prices ranging from $.37 to $.38

  per share.  Then, between 1:50 p.m. and 4:31 p.m., they sold all 910,500 shares in

  their accounts at prices ranging from $.31 to $.49 per share, realizing a profit of

  approximately $93,523.  *Conroy Decl. ¶61.*

### Netguru, Inc.

- The Company:  Netguru, Inc. is a Yorba Linda, California entity that purports to

  be an integrated Internet technology and services company.  Until December 15,

  2006, the company traded on the Nasdaq Capital Market under the symbol

  NGRU.  On March 24, 2006, NGRU was the subject of online intrusions at TD

  Ameritrade.  *Conroy Decl. ¶62.*

- The Buy-Up:  Prior to the intrusions, between March 13, 2006 and March 24,

  2006 at 9:31 a.m., the Unknown Traders accumulated in their own accounts

  445,650 shares of NGRU at $.41 to $.62 per share.  *Conroy Decl. ¶¶64.*

- The Intrusions:  Beginning approximately one hour later, on March 24, 2006,

  between 1:27 p.m. and 3:44 p.m., one or more of the Defendants intruded into two

  accounts at TD Ameritrade and purchased 1,062,000 and sold 694,800 shares of

  NGRU.  *Heeney Decl. ¶¶36-40.*

- Effect on the Market:  On March 24, 2006, NGRU opened at $.62 per share and

  increased to an intra-day high of $.97 per share on volume of 6,270,864 shares,

compared to its prior 15-day historical average trading volume of 848,233 shares. *Conroy Decl. ¶63.*

- <u>The Sell-Off</u>:  Contemporaneously with the intrusions, on March 24, 2006, beginning at 3:18 p.m., the Unknown Traders sold all 445,650 of their NGRU shares in their accounts at prices ranging from $.79 to $.94 per share, realizing a profit of approximately $165,468.  *Conroy Decl. ¶65.*

### Integrated Alarm Services Group, Inc.

- <u>The Company</u>:  Integrated Alarm Services Group, Inc. is an Albany, New York-based purported supplier of services to independent security alarm dealers.  The company trades on the Nasdaq Global Market under the symbol IASG.  On February 17, 2006, IASG was the subject of online intrusions at Merrill Lynch and TD Ameritrade.  *Conroy Decl. ¶66.*

- <u>The Buy-Up</u>:  From February 3, 2006, until February 17, 2006 at 1:21 p.m., the Unknown Traders accumulated in their own accounts 63,300 shares of IASG at prices ranging from $2.88 to $3.67 per share.  *Conroy Decl. ¶68.*

- <u>The Intrusions</u>:  On February 17, 2006, between 11:50 a.m. and 3:15 p.m., one or more of the Defendants intruded into an account at Merrill Lynch and purchased 26,900 shares of IASG.  *Mandel Decl. ¶¶14-16.*  Additionally, between 1:22 p.m. and 2:00 p.m., the Defendants intruded into an account at TD Ameritrade, purchased 234,890 shares of IASG and sold 67,324 shares in the account.  *Heeney Decl. ¶¶53-55.*

- <u>Effect on the Market</u>:  On February 17, 2006, IASG opened at $3.50 per share and increased to an intra-day high of $4.27 per share on volume of 827,513 shares,

- 35 -

compared to its prior 15-day historical average trading volume of 115,914 shares. *Conroy Decl. ¶67.*

- <u>The Sell-Off</u>: Contemporaneously with the intrusions, on February 17, 2006, between 2:48 p.m. and 2:57 p.m., the Unknown Traders sold their 63,300 IASG shares in their own accounts at prices ranging from $3.66 to $3.98 per share, realizing a profit of approximately $5,067. *Conroy Decl. ¶69.*

### I-Many, Inc.

- <u>The Company</u>: I-Many, Inc. is an Edison, New Jersey-based purported provider of Internet Solutions and related professional services. The company trades on the Nasdaq Global Market under the symbol IMNY. On March 8, 2006, IMNY was the subject of online intrusions at Scottrade, Merrill Lynch, TD Ameritrade and Schwab. *Conroy Decl. ¶70.*

- <u>The Buy-Up</u>: Between February 17, 2006 and March 8, 2006 at 1:08 p.m., the Unknown Traders accumulated in their own accounts 107,750 shares of IMNY at prices ranging from $1.55 to $1.84 per share. *Conroy Decl. ¶72.*

- <u>The Intrusions</u>: On March 8, 2006, between 1:26 p.m. and 2:06 p.m., one or more of the Defendants intruded into an account at TD Ameritrade and purchased 81,500 shares of IMNY. *Heeney Decl. ¶¶47-52.* Additionally, from 12:43 p.m. to 3:03 p.m., the Defendants intruded into six Scottrade accounts and purchased a total of 233,300 shares of IMNY. *Hough Decl. ¶¶30-47.* Between 12:46 p.m. and 2:55 p.m., the Defendants intruded into two accounts at Merrill Lynch and purchased 117,900 shares of IMNY. *Mandel Decl. ¶¶9-13.* Finally, from 1:19

p.m. to 2:11 p.m., the Defendants intruded into two Schwab accounts and purchased 118,610 shares of IMNY. *Stewart Decl. ¶¶39-43.*

- Effect on the Market:  On March 8, 2006, IMNY opened at $1.81 per share and increased to an intra-day high of $2.08 per share on volume of 1,767,826 shares, compared to its prior 15-day historical average trading volume of 148,555 shares. *Conroy Decl. ¶71.*

- The Sell-Off:  Contemporaneously with the intrusions, on March 8, 2006, beginning at 3:19 p.m., the Unknown Traders sold their 107,750 shares of IMNY in their accounts at prices ranging from $1.79 to $2.00 per share, realizing a profit of approximately $22,130. *Conroy Decl. ¶73.*

### Tapestry Pharmaceuticals, Inc.

- The Company:  Tapestry Pharmaceuticals, Inc. is a Colorado company purportedly focused on developing proprietary therapies for cancer treatment. The company trades on the Nasdaq Capital Market under the symbol TPPH. On December 21, 2005, TPPH was the subject of online intrusions at Scottrade and TD Ameritrade. *Conroy Decl. ¶74.*

- The Buy-Up:  Prior to the intrusions, between December 19, 2005 and December 21, 2005 at 1:42 p.m., the Unknown Traders accumulated in their own accounts 310,000 shares of TPPH at prices ranging from $.31 to $.43 per share. *Conroy Decl. ¶76.*

- The Intrusions:  On December 21, 2005, between 12:45 p.m. and 2:36 p.m., one or more of the Defendants intruded into two accounts at TD Ameritrade and purchased 161,600 TPPH shares. *Heeney Decl. ¶¶58-62.*  In addition, from 12:45

p.m. to 2:36 p.m., the Defendants intruded into three accounts at Scottrade and purchased 514,400 shares of TPPH. *Hough Decl. ¶¶9-17.*

- Effect on the Market:  On December 21, 2005, TPPH opened at $.34 per share and increased to an inter-day and 52-week high of $.70 per share on volume of 2,614,704 shares, compared to its prior 15-day historical average trading volume of 146,597 shares. *Conroy Decl. ¶75.*

- The Sell-Off:  Approximately one hour later, on December 21 at 3:49 p.m., the Unknown Traders sold their 310,000 TPPH shares in their own accounts at $.45 per share, realizing a profit of approximately $25,828. *Conroy Decl. ¶77.*

### Onvia, Inc.

- The Company:  Onvia, Inc. is a Seattle, Washington-based company that purports to operate an online exchange for small businesses.  The company trades on the Nasdaq Global Market under the symbol ONVI.  On December 21, 2005, ONVI was the subject of online intrusions at Merrill Lynch and Schwab. *Conroy Decl. ¶78.*

- The Buy-Up:  Prior to the intrusions, on December 20, 2005 at 3:18 p.m., the Unknown Traders purchased in their own accounts 5,000 shares of ONVI at $4.44 per share. *Conroy Decl. ¶80.*

- The Intrusions:  On December 21, 2005, at 10:15 a.m., one or more of the Defendants intruded into an account at Merrill Lynch and purchased 24,000 shares of ONVI. *Mandel Decl. ¶¶17-19.*

- Effect on the Market:  On December 21, 2005, ONVI opened at $4.30 per share and increased to an intra-day high of $5.50 per share on volume of 43,313 shares,

compared to its prior 15-day historical average trading volume of 9,792 shares. *Conroy Decl.* ¶*79.*

- The Sell-Off:  Shortly after the intrusions, on December 21, 2005, at 12:03 p.m., the Unknown Traders sold in their own accounts their 5,000 ONVI shares at $4.54 per share, realizing a profit of approximately $503. *Conroy Decl.* ¶*81.*

### BriteSmile, Inc.

- The Company:  BriteSmile, Inc. is a Walnut Creek, California company purportedly engaged in the development, distribution, and marketing of teeth whitening processes.  The company trades on the Nasdaq Capital Market under the symbol BSML.  On December 21, 2005, BSML was the subject of online intrusions at Scottrade. *Conroy Decl.* ¶*82.*

- The Buy-Up:  On December 21, 2005, between 3:50 p.m. and 3:56 p.m., the Unknown Traders purchased in their own accounts 80,000 shares of BSML at prices ranging from $.75 to $.79 per share. *Conroy Decl.* ¶*84.*

- The Intrusions:  That same day, between 2:42 p.m. and 3:49 p.m., one of more of the Defendants intruded into two Scottrade accounts and purchased 367,888 shares of BSML. *Hough Decl.* ¶¶*18-23.*

- Effect on the Market:  On December 21, 2005, BSML opened at $.57 per share and increased to an inter-day high of $1.74 per share on volume of 1,163,590 shares, compared to its prior 15-day historical average trading volume of 61,580 shares. *Conroy Decl.* ¶*83.*

- The Sell-Off:  Contemporaneously with the intrusions, on December 21, 2005, between 4:26 p.m. and 4:49 p.m., the Unknown Traders sold the BSML shares in

their own accounts at prices ranging from $1.04 to $1.35 per share, realizing a profit of approximately $36,646. *Conroy Decl.* ¶*85.*