IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION :

               Plaintiff, :

     vs. :          Civil No.

ONE OR MORE UNKNOWN TRADERS :
IN THE COMMON STOCK OF CERTAIN
ISSUERS, :

        Defendants, :

   and :

JSC PAREX BANK, :

      Relief Defendant. :

**NOTICE OF FILING OF DECLARATIONS IN SUPPORT OF *EX PARTE*
MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW
CAUSE, FREEZE ORDER, AND OTHER RELIEF**

**PLEASE TAKE NOTICE** that the Plaintiff Securities and Exchange Commission ("Commission") has filed the following documents attached hereto in support of its *Ex Parte* Motion For Temporary Restraining Order, Order To Show Cause, Freeze Order, And Other Relief

ATTACHMENT A    DECLARATION OF JAMES AUTREY

ATTACHMENT B    DECLARATION OF ELLIS HOUGH

ATTACHMENT C    DECLARATION OF JAMES M. HEENEY

ATTACHMENT D    DECLARATION OF MARK STEWART

ATTACHMENT E    DECLARATION OF EDWARD MOORE

ATTACHMENT F    DECLARATION OF RICHARD L. MANDEL

ATTACHMENT G    DECLARATION OF PAULINE C. SCALVINO

ATTACHMENT H    DECLARATION OF KIMBERLY MILLER

ATTACHMENT I    DECLARATION OF THOMAS CONROY

DATED:  March 6, 2007

Respectfully submitted,

Kenneth Guido, Trial Counsel (D.C. Bar No. 151605)
John Reed Stark
Thomas A. Sporkin
N. Blair Vietmeyer
Sarit Klein
David Smyth
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
(202) 551-4480 (Guido)
(202) 772-9245 (Fax)
E-mail:  guidok@sec.gov

Attachments

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, DC 20549, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| vs. | :        Civil No. <br> : |
| ONE OR MORE UNKNOWN TRADERS<br>IN THE COMMON STOCK OF CERTAIN<br>ISSUERS, | : <br> : <br> : <br> : |
| Defendants, | : <br> : |
| and | : <br> : |
| JSC PAREX BANK, | : <br> : |
| Relief Defendant. | : <br> : |

## DECLARATION OF THOMAS P. CONROY IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE, PRELIMINARY INJUNCTION AND ORDER GRANTING OTHER RELIEF

I, Thomas P. Conroy, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I am a Market Surveillance Specialist in the Division of Enforcement of the United States Securities and Exchange Commission (the "Commission"). As part of my daily surveillance activities, I review and analyze market trading data to identify suspicious trading activities in securities quoted on U.S. exchanges. I have been employed by the Commission since January 2003. During my tenure with the Commission, I have assisted the Division of Enforcement Staff on numerous enforcement actions, including market manipulation investigations. I have in excess of fifteen years of

experience working in the brokerage industry, including four years of employment in the Division of Trading and Markets of the Commodity Futures Trading Commission, six years as Vice President of Compliance of Fuji Securities (and its successors), three years as Vice President of Compliance of Mid-America Commodity Exchange, four years as an investigator for the Chicago Board Options Exchange and four years as Vice President of Compliance of LFG Securities. Among other duties, in my capacity as Vice President of Compliance, I monitored and analyzed the markets to identify suspicious trading activities. I have a Master of Science degree in Accounting and I have held the following Series Registrations: S-4 (Options Principal), S-7 (General Securities Representative), S-24 (General Securities Principal) and S-27 (Financial and Operations Principal).

2.    I base this declaration upon personal knowledge obtained during the course of this investigation. I have reviewed detailed trading records, market data, account documents, sworn declarations, and other relevant data, and have discussed this investigation with other members of the Division of Enforcement Staff (the "Staff").

3.    Since approximately 2005, the Staff has been investigating unauthorized intrusions into dozens of on-line brokerage accounts at multiple U.S. broker-dealers. The *modus operandi* is the same for each intrusion. First, the intruders purchase in their own accounts shares of thinly traded companies. Next, they use the Internet to illegally gain access to account holders' usernames and passwords. Armed with this personal information, the hackers then surreptitiously enter the victim's online account, sell existing equity positions and, using the proceeds from those sales, purchase the same thinly traded stocks previously purchased by the intruders in their own accounts. These purchases create the appearance of trading activity and pump-up the price of the stocks.

Then, at the height of the pump, the intruders or others acting in concert profit by selling their own shares of the same stocks that they purchased in their own accounts prior to the intrusions.

4.     The online brokerage account intrusion scheme is a combination of the traditional identity theft scam combined with the conventional "pump-and-dump" scheme, in which fraudsters manipulated the price of a stock through the dissemination of false and misleading statements to the marketplace. In this new, high-tech iteration of the scheme, cyber criminals use the Internet to misappropriate the identification information and passwords of unwitting customers and use the stolen information to intrude into and place unauthorized trades in unwitting customers' online accounts. The stolen personal information often is obtained through the use of keystroke-logging programs, a type of spyware which enables one computer user to remotely monitor the keystroke activity of another computer user.

5.     The modern intrusion manipulation scheme is an exponentially growing problem that has resulted in large losses to investors and the brokerage industry.

6.     On December 23, 2005, the Staff was notified by members of the Enforcement Division of the National Association of Securities Dealers ("NASD") of an unauthorized online account intrusion that occurred at Merrill Lynch & Co., Inc. ("Merrill Lynch") on December 21, 2005. At 10:15 a.m. on December 21, one or more unauthorized persons intruded into the online brokerage account of a Merrill Lynch customer, liquidated the accountholder's existing positions, and purchased 24,000 shares of Onvia, Inc. ("ONVI"), a thinly traded stock quoted on the Nasdaq Global Market.

7.      The Staff promptly initiated an inquiry and learned that between December 2005 and March 2006, Merrill Lynch experienced account intrusions involving additional stocks other than ONVI.  Namely, on February 17, 2006, an account at Merrill Lynch was intruded into and used to buy shares of Integrated Alarm Services Group, Inc. ("IASG").  Similarly, on March 8, 2006, two accounts were intruded into and used to purchase shares of I-Many, Inc. ("IMNY").

8.      The Staff then undertook to determine whether other broker-dealers experienced intrusions involving these same issuers by contacting representatives of the major online broker-dealers, including E*Trade Securities, LLC ("E*Trade"), Scottrade, Inc. ("Scottrade"), TD Ameritrade, Inc. ("TD Ameritrade"), Vanguard Brokerage Services ("Vanguard"), Fidelity Investments ("Fidelity") and Charles Schwab & Co., Inc. ("Schwab").

9.      Through its communications with these broker-dealers, the Staff learned that on February 17, 2006, an account at TD Ameritrade was intruded into and unauthorized buy and sell orders of IASG were placed in the account.  Additionally, the Staff learned that on March 8, 2006, TD Ameritrade, Scottrade and Schwab all experienced intrusions involving IMNY.

10.     Once the staff initiated its inquiry, several of the broker-dealers began reporting instances of intrusions directly to the Staff.  Through these communications, the Staff learned that between December 21, 2005 and December 4, 2006, one or more of the broker-dealers experienced unauthorized intrusions and trading involving the following additional companies:  Remote Dynamics, Inc., DepoMed, Inc., Orchid Cellmark, Inc., Repligen Corp., Dura Automotive Systems, Inc., Valentis, Inc., WTS Dime Bankcorp.,

Inc., Bluefly, Inc., Netwolves Corp., Netguru, Inc., Tapestry Pharmaceuticals, Inc. and BriteSmile, Inc.

11.     In an effort to identify of the potential perpetrators of the scheme, the Staff ran electronic Equity Cleared Reports for the specific securities and intrusion dates in question. Equity Cleared Reports reflect, for a given security and a given date range, the identities of the clearing brokers whose customers and/or introducing brokers engage in trading activity, including the number of buy and sell items, the buy and sell trading volumes, and the buy and sell aggregate dollar amounts.

12.     Based on the information contained in the Equity Cleared Reports, the Staff "Blue Sheeted" the securities for the intrusion dates in question. Blue Sheeting refers to an electronic program that allows broker-dealer firms to scan their account records and transmit to the Commission the identity of individuals, entities and firms that traded a stock on a particular day. Using this information, the Commission Staff can compile a detailed report which, among other things, identifies the net proceeds realized by each account trading the stock.

13.     A review of the Blue Sheet records for the dates on which the reporting broker-dealers experienced intrusions revealed that on each of the days on which accounts were compromised, accounts titled in the name of JSC Parex Bank ("Parex"), held at Pinnacle Capital Markets, LLC ("Pinnacle") sold shares in the same stocks and realized profits from their trading.

14.     Pinnacle is a registered broker-dealer located in Raleigh, North Carolina. Pinnacle's trades are cleared through Penson Financial Services, Inc. ("Penson"). Based in part on the Staff's review of the Blue Sheet Reports, and pursuant to the Staff's

authority under Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

the Staff sent written requests for documents to Penson requesting, among other things,

(a) account opening documents for the accounts titled in the name of JSC Parex Bank that

profited from trading in the affected issuers on the intrusion dates; (b) monthly and

periodic account statements for the Parex accounts; (c) trade blotters indicating specific

times that trades were placed in the Parex accounts; (d) documents reflecting

correspondence with Parex; and (e) incoming and outgoing wire information for accounts

titled in the name of Parex that traded the stocks on the intrusion dates.

15.     Due to Parex's suspicious trading pattern, the Staff did not send a request directly

to Pinnacle for fear that the accountholders might be alerted to the Commission's request

and move their ill-gotten proceeds held in the Parex accounts offshore.

16.     A review of the Parex account opening documents provided by Penson revealed

that it is a foreign entity whose address is 3 Smilshu Street, Riga, Latvia, LV-1522.

Based on a review of the account documents and conversations between the Staff and

representatives of Penson, Parex opened an omnibus brokerage account at Pinnacle in

June 2002 and, since then, has opened a total of seventy-five (75) sub-accounts of the

omnibus account, all titled in Parex's corporate name. The most recent sub-account was

opened in December 2006. According to the account opening documents, the sub-

accounts are not separate accounts for any purpose except to separate securities into

separate groups for the convenience of the customer to view the sub-accounts.

17.     The trading authorization forms executed on behalf of Parex list the bank's

president, vice president and chairman of the board as the individuals authorized to open

accounts and trade in the omnibus account and the sub-accounts. Parex is routinely commingling funds among its omnibus account and its sub-accounts.

18.    Through further investigation, the Staff determined that Parex maintains a website with the domain name www.parex.lv and allows its customers to access their accounts online via that website by entering a username and password directly onto the website. Once logged in, customers can access their Parex accounts and request that trades be placed in the Parex accounts at Pinnacle for stocks and options traded via a number of foreign exchanges, including major U.S. exchanges and markets such as the New York Stock Exchange and the National Association of Securities Dealers Automated Quotation ("Nasdaq") Service. Parex charges its customers a commission for each trade executed in the Parex accounts.

19.    The Staff analyzed Parex's account statements and trade blotter information provided by Penson, which confirmed that, between December 21, 2005 and December 4, 2006, four of the Parex sub-accounts executed transactions in the same securities that were subject to intrusions on or around the same days that the intrusions occurred. In at least fifteen instances, the accounts reaped a profit from the suspicious trading.

20.    Pursuant to Exchange Act §17(a), the Staff sent written requests for information to E*Trade, Scottrade, TD Ameritrade, Vanguard, Fidelity, Schwab and Merrill Lynch requesting, among other information: (a) time-stamped securities transaction details concerning customer brokerage accounts that made purchases corresponding to the securities and dates associated with the suspicious instances in the Parex accounts;

(b) records of electronic logins by these customers, including the Internet Protocol ("IP")
address used to log in and out of the accounts; and (c) account opening documents
relating to these customers.

21.    A review of these records revealed that the securities transactions effectuated in
the victim accounts were not placed by the customers.  The Staff spoke with
representatives of the various broker-dealers regarding the firms' determination that the
trades were unauthorized.  Based on these conversations, the Staff learned that the
broker-dealers analyzed a combination of factors in reaching this conclusion. This
included reviewing the historical IP address login of the customer's account and
comparing the IP addresses that accessed the account when there was no suspicious
trading activity with the IP address that logged into the account at the time of the
unauthorized trading activity.  If the IP address in question was out-of-pattern in that it
originated from a different geographical area than the address on the account registration
or used a different Internet Service Provider than the prior IP addresses used to access the
account, then that was an indication that the trading likely was unauthorized.
Additionally, a number of the broker-dealers interviewed their customers to confirm that
the trades were not placed by the customer.  Others also analyzed the nature of the
unauthorized trades as compared with the customer's trading history.

22.    The Staff to date has been unable to identify definitively the individuals who
effectuated the trades in the Parex sub-accounts because the account opening documents
do not identify the beneficial owners of the sub-accounts.  In addition, the Staff has been
unable to identify the individual(s) who intruded into the online accounts because they
appear to have employed Internet Protocol masking techniques to conceal their identities.

As such, the IP addresses used to intrude into the account trace back to innocent third parties whose computers appear to have been hijacked to effectuate the intrusions.

23.     Nevertheless, the timing of the intrusions involving a total of fifteen separate issuers and the unauthorized trading of these thinly traded companies in the compromised accounts, coupled with the coinciding trading pattern and consistent profits realized repeatedly in the Parex accounts, compel the conclusion that certain individuals trading anonymously through the Parex accounts are deliberately perpetrating this fraudulent scheme.

24.     Moreover, although the information the Staff has been able to obtain to date has been limited to intrusions involving these fifteen stocks, the trade blotters provided by Penson reveal other suspicious trading by the Parex sub-accounts involving additional stocks that fit the pattern of trading in the Parex sub-accounts with respect to the fifteen intruded issuers.  The Staff has not yet tied these additional trades to specific instances of intrusions.  Nevertheless, it is highly possible that it will uncover evidence of additional intrusions which could further implicate the Parex accounts and result in even greater ill-gotten profits.

25.     The following is an analysis of the suspicious trading in the Parex sub-accounts for the period December 21, 2005 through December 4, 2006:

### Remote Dynamics, Inc.

26.     Remote Dynamics, Inc. is a Richardson, Texas-based purported developer and owner of mobile resource management technologies.  Until February 21, 2006, the company traded on the Nasdaq Capital Market under the ticker symbol REDI.  On

February 9, 2006, REDI was the subject of online intrusions at TD Ameritrade, Scottrade and E*Trade.

27.     On February 9, 2006, REDI opened at $.29 per share and increased to an intra-day and 52-week high of $1.10 per share on volume of 3,943,257 shares compared to its prior 15-day historical average trading volume of 132,882 shares.

28.     In the days leading up to the intrusions, from February 3, 2006 until February 8, 2006, the Unknown Trader Defendants accumulated 580,240 shares of REDI at prices ranging from $.24 to $.29 per share, and sold 68,040 shares at $.23 to $.25 per share.

29.     Concurrently with the Intrusions, on February 9, 2006, between 2:38 p.m. and 3:06 p.m.,[1] the Unknown Trader Defendants sold their 512,200 REDI shares, as well an additional 9,800 shares they previously purchased in their accounts, at prices ranging from $.36 to $.54 per share, realizing a profit of at least $75,720.

### DepoMed, Inc.

30.     DepoMed, Inc. is a Menlo Park, California-based company that purports to develop proprietary oral drug delivery technologies. The company trades on the Nasdaq Global Market under the symbol DEPO. On December 4, 2006, REDI was the subject of online intrusions at TD Ameritrade, Scottrade, Fidelity and Schwab.

31.     On December 4, 2006, DEPO opened at $3.62 per share and increased to an intra-day high of $3.79 per share on volume of 2,356,336 shares, compared to its prior 15-day historical average trading volume of 347,627 shares.

32.     Prior to the intrusions, on December 1, 2006, the Unknown Trader Defendants bought in their own accounts 389,461 shares of DEPO at prices ranging from $3.35 to $3.75 per share, and sold 2,739 shares at $3.37 to $3.41 per share.

---

[1]   All times set forth herein are in the Eastern Time Zone.

33.    At the height of the price surge, on December 4, 2006, between 2:40 p.m. and 3:44 p.m., the Unknown Trader Defendants sold 251,254 shares of DEPO in their own accounts at prices ranging from $3.17 per share to $3.99 per share, realizing profits of at least $51,078.

### Orchid Cellmark, Inc.

34.    Orchid Cellmark, Inc. is a Princeton, New Jersey based company that purports to offer human and agricultural DNA testing services. The company trades on the Nasdaq Global Market under the symbol ORCH. On November 15, 2006, ORCH was the subject of online intrusions at TD Ameritrade, Scottrade and Schwab.

35.    On November 15, 2006, ORCH opened at $3.65 per share and climbed to an intra-day high of $4.08 per share on volume of 1,153,767 shares, compared to its prior 15-day historical average of 138,179 shares.

36.    Prior to the intrusions, on November 14, 2006, the Unknown Trader Defendants bought 157,466 shares of ORCH in their own accounts at prices ranging from $3.25 to $3.70 per share.

37.    Concurrently with the intrusions, on November 15, between 12:10 p.m. and 1:52 p.m., the Unknown Trader Defendants sold all 157,466 of their ORCH shares in their own accounts at prices ranging from $3.51 to $4.06 per share, realizing a profit of approximately $55,783.

### Repligen Corp.

38.    Repligen Corp. is a Waltham, Massachusetts entity that purports to develop new drugs for autism, organ transplantation and cancer. The company trades on the Nasdaq

Global Market under the symbol RGEN. On October 2, 2006, RGEN was the subject of online intrusions at TD Ameritrade, Scottrade, E*Trade, Fidelity and Schwab.

39.     On October 2, 2006, RGEN opened at $3.40 per share and increased to an intra-day high of $4.17 per share on volume of 1,264,748 shares, compared to its prior 15-day historical average trading volume of 52,456 shares.

40.     Prior to the intrusions, from September 28, 2006, to October 2, 2006, the Unknown Trader Defendants purchased in their own accounts 41,720 shares of RGEN at prices ranging from $3.05 to $3.24 per share.

41.     Concurrently with the intrusions, on October 2, 2006, between 1:05 p.m. and 1:50 p.m., the Unknown Trader Defendants sold in their own accounts all 41,720 of their RGEN shares at prices ranging from $3.65 to $4.00 per share, realizing a profit of approximately $28,057.

### Dura Automotive Systems, Inc.

42.     Dura Automotive Systems, Inc. is a Rochester Hills, Michigan entity purportedly engaged in the design and manufacture of automobile industry systems. Until November 8, 2006, the company traded on the Nasdaq Global Market under the symbol DRRA. On August 28, 2006, DRRA was the subject of online intrusions at TD Ameritrade, Scottrade, E*Trade and Schwab.

43.     On August 28, 2006, DRRA opened at $.54 per share and increased to an intra-day high of $.66 per share on volume of 4,759,599 shares, compared to its prior 15-day historical average trading volume of 495,289 shares.

44.    Prior to the intrusions, from August 15, 2006 until August 28, 2006, the Unknown Trader Defendants accumulated in their own accounts 355,500 shares of DRRA at prices ranging from $.39 to $.45 per share.

45.    Concurrently with the intrusions, on August 28, 2006, between 1:06 p.m. and 2:33 p.m., the Unknown Trader Defendants sold their 355,500 DRRA shares in their own accounts at prices ranging from $.58 to $.61 per share, realizing a profit of approximately $51,511.

**Valentis, Inc.**

46.    Valentis, Inc. is a Burlingame, California-based purported biotechnology company trading on the Nasdaq Capital Market under the symbol VLTS. On July 28, 2006, VLTS was the subject of unauthorized intrusions at Scottrade, TD Ameritrade, E*Trade and Schwab.

47.    On July 28, 2006, VLTS opened at $.65 per share and increased to an intra-day high of $.67 per share on volume of 3,723,383 shares, compared to its prior 15-day historical average trading volume of 1,704,102 shares.

48.    Prior to the intrusions, between July 25, 2006 and July 27, 2006, the Unknown Trader Defendants accumulated in their own accounts 446,977 shares of VLTS at prices ranging from $.34 to $.44 per share, and sold 3,267 shares at $.35 to $.40 per share.

49.    Contemporaneously with the intrusions, on July 28, 2006, between 11:03 a.m. and 11:05 a.m., the Unknown Trader Defendants bought an additional 210 shares of VLTS in their own accounts at $.61 to $.63 per share and, beginning at 12:43 p.m., sold all of their remaining 443,920 of their VLTS shares at prices ranging from $.53 to $.67 per share, realizing a profit of at least $92,541.

## WTS Dime Bancorp, Inc.

50.    WTS Dime Bancorp, Inc. is a bankrupt New York based company whose shares

trade as litigation tracking warrants.  The company trades on the Nasdaq Global Market

under the symbol DIMEZ.  On July 6, 2006, DIMEZ was the subject of unauthorized

intrusions at Scottrade and Vanguard.

51.    On July 6, 2006, DIMEZ opened at $.25 per share and increased to an intra-day

high of $.30 per share on volume of 14,791,078 shares, compared to its prior 15-day

historical average trading volume of 292,982 shares.

52.    Prior to the intrusions, between June 21, 2006 and July 6, 2006 at 12:29 p.m., the

Unknown Trader Defendants accumulated 897,000 shares of DIMEZ in their own

accounts at prices ranging from $.16 to $.29 per share, and sold 5,500 shares at $.21 to

$.28 per share.

53.    Contemporaneously with the intrusions, on July 6, 2006, beginning at 1:11 p.m.,

the Unknown Trader Defendants sold in their own accounts their remaining 891,500

shares of DIMEZ at prices ranging from $.17 to $.30 per share, realizing a profit of

approximately $60,378.

## Bluefly, Inc.

54.    Bluefly, Inc. purports to be a New York-based Internet retailer of apparel,

accessories and home furnishings.  The company trades on the Nasdaq Capital Market

under the symbol BFLY.  On May 17, 2006, BFLY was the subject of unauthorized

intrusions at E*Trade.

55.    On May 17, 2006, BFLY opened at $0.72 per share and rose to a high of $1.01 per share on volume of 1,535,886 shares, compared to its prior 15-day historical average trading volume of 204,771 shares.

56.    On May 17, 2006, between 2:41 p.m. and 3:02 p.m., the Unknown Trader Defendants purchased in their own accounts 121,000 shares of BFLY at prices ranging from $.81 to $.99 per share.

57.    Then, after the intrusions began, and at the height of the resulting price surge on May 17, 2006, between 3:28 p.m. and 3:36 p.m., the Unknown Trader Defendants sold their 121,000 BFLY shares in their own accounts at prices ranging from $.97 to $.99 per share, realizing a profit of approximately $6,843.

### NetWolves Corp.

58.    NetWolves Corp. is a Tampa, Florida-based company that purports to produce software and hardware technologies.  Until May 16, 2006, the company traded on the Nasdaq Capital Market under the symbol WOLV.  On April 13, 2006, WOLV was the subject of online intrusions at E*Trade, Scottrade and Fidelity.

59.    On April 13, 2006, WOLV opened at $.35 per share and increased to an intra-day and 52-week high of $.49 per share on volume of 5,703,476 shares, compared to its 15-day average trading volume of 371,619 shares.

60.    Prior to the intrusions, from March 28, 2006 until April 13, 2006 at 12:22 p.m., the Unknown Trader Defendants accumulated in their own accounts 909,700 shares in WOLV at prices ranging from $.27 to $.38 per share.

61.    Contemporaneously with the intrusions, on April 13, 2006, between 10:58 a.m. and 1:22 p.m., the Unknown Trader Defendants bought an additional 800 shares of

WOLV in their own accounts at prices ranging from $.37 to $.38 per share. Then, between 1:50 p.m. and 4:31 p.m., they sold all 910,500 shares in their accounts at prices ranging from $.31 to $.49 per share, realizing a profit of approximately $93,523.

### Netguru, Inc.

62.     Netguru, Inc. is a Yorba Linda, California entity that purports to be an integrated Internet technology and services company. Until December 15, 2006, the company traded on the Nasdaq Capital Market under the symbol NGRU. On March 24, 2006, NGRU was the subject of online intrusions at TD Ameritrade.

63.     On March 24, 2006, NGRU opened at $.62 per share and increased to an intra-day high of $.97 per share on volume of 6,270,864 shares, compared to its prior 15-day historical average trading volume of 848,233 shares.

64.     Prior to the intrusions, between March 13, 2006 and March 24, 2006 at 9:31 a.m., the Unknown Trader Defendants accumulated in their own accounts 445,650 shares of NGRU at $.41 to $.62 per share.

65.     Contemporaneously with the intrusions, on March 24, 2006, beginning at 3:18 p.m., the Unknown Trader Defendants sold all 445,650 of their NGRU shares in their accounts at prices ranging from $.79 to $.94 per share, realizing a profit of approximately $165,468.

### Integrated Alarm Services Group, Inc.

66.     Integrated Alarm Services Group, Inc. is an Albany, New York-based purported supplier of services to independent security alarm dealers. The company trades on the Nasdaq Global Market under the symbol IASG. On February 17, 2006, IASG was the subject of online intrusions at Merrill Lynch and TD Ameritrade.

67.    On February 17, 2006, IASG opened at $3.50 per share and increased to an intra-day high of $4.27 per share on volume of 827,513 shares, compared to its prior 15-day historical average trading volume of 115,914 shares.

68.    From February 3, 2006, until February 17, 2006 at 1:21 p.m., the Unknown Trader Defendants accumulated in their own accounts 63,300 shares of IASG at prices ranging from $2.88 to $3.67 per share.

69.    Contemporaneously with the intrusions, on February 17, 2006, between 2:48 p.m. and 2:57 p.m., the Unknown Trader Defendants sold their 63,300 IASG shares in their own accounts at prices ranging from $3.66 to $3.98 per share, realizing a profit of approximately $5,067.

### I-Many, Inc.

70.    I-Many, Inc. is an Edison, New Jersey-based purported provider of Internet Solutions and related professional services. The company trades on the Nasdaq Global Market under the symbol IMNY. On March 8, 2006, IMNY was the subject of online intrusions at Scottrade, Merrill Lynch, TD Ameritrade and Schwab.

71.    On March 8, 2006, IMNY opened at $1.81 per share and increased to an intra-day high of $2.08 per share on volume of 1,767,826 shares, compared to its prior 15-day historical average trading volume of 148,555 shares.

72.    Between February 17, 2006 and March 8, 2006 at 1:08 p.m., the Unknown Trader Defendants accumulated in their own accounts 107,750 shares of IMNY at prices ranging from $1.55 to $1.84 per share.

73.    Contemporaneously with the intrusions, on March 8, 2006, beginning at 3:19 p.m., the Unknown Trader Defendants sold their 107,750 shares of IMNY in their

accounts at prices ranging from $1.79 to $2.00 per share, realizing a profit of approximately $22,130.

### Tapestry Pharmaceuticals, Inc.

74.    Tapestry Pharmaceuticals, Inc. is a Colorado company purportedly focused on developing proprietary therapies for cancer treatment.  The company trades on the Nasdaq Capital Market under the symbol TPPH.  On December 21, 2005, TPPH was the subject of online intrusions at Scottrade and TD Ameritrade.

75.    On December 21, 2005, TPPH opened at $.34 per share and increased to an inter-day and 52-week high of $.70 per share on volume of 2,614,704 shares, compared to its prior 15-day historical average trading volume of 146,597 shares.

76.    Prior to the intrusions, between December 19, 2005 and December 21, 2005 at 1:42 p.m., the Unknown Trader Defendants accumulated in their own accounts 310,000 shares of TPPH at prices ranging from $.31 to $.43 per share.

77.    Approximately one hour later, on December 21 at 3:49 p.m., the Unknown Trader Defendants sold their 310,000 TPPH shares in their own accounts at $.45 per share, realizing a profit of approximately $25,828.

### Onvia, Inc.

78.    Onvia, Inc. is a Seattle, Washington-based company that purports to operate an online exchange for small businesses.  The company trades on the Nasdaq Global Market under the symbol ONVI.  On December 21, 2005, ONVI was the subject of online intrusions at Merrill Lynch and Schwab.

79.    On December 21, 2005, ONVI opened at $4.30 per share and increased to an intra-day high of $5.50 per share on volume of 43,313 shares, compared to its prior 15-day historical average trading volume of 9,792 shares.

80.    Prior to the intrusions, on December 20, 2005 at 3:18 p.m., the Unknown Trader Defendants purchased in their own accounts 5,000 shares of ONVI at $4.44 per share.

81.    Shortly after the intrusions, on December 21, 2005, at 12:03 p.m., the Unknown Trader Defendants sold in their own accounts their 5,000 ONVI shares at $4.54 per share, realizing a profit of approximately $503.

## BriteSmile, Inc.

82.    BriteSmile, Inc. is a Walnut Creek, California company purportedly engaged in the development, distribution, and marketing of teeth whitening processes. The company trades on the Nasdaq Capital Market under the symbol BSML. On December 21, 2005, BSML was the subject of online intrusions at Scottrade.

83.    On December 21, 2005, BSML opened at $.57 per share and increased to an inter-day high of $1.74 per share on volume of 1,163,590 shares, compared to its prior 15-day historical average trading volume of 61,580 shares.

84.    On December 21, 2005, between 3:50 p.m. and 3:56 p.m., the Unknown Trader Defendants purchased in their own accounts 80,000 shares of BSML at prices ranging from $.75 to $.79 per share.

85.    Contemporaneously with the intrusions, on December 21, 2005, between 4:26 p.m. and 4:49 p.m., the Unknown Trader Defendants sold the BSML shares in their own accounts at prices ranging from $1.04 to $1.35 per share, realizing a profit of approximately $36,646.

86.    As a result of their trading in these fifteen issuers, the Parex accounts realized ill-gotten gains totaling at least $732,941 from the trades in their accounts.

87.    In addition, the broker-dealers whose customer accounts were compromised suffered losses in excess of $2 million in their efforts to make their customers whole. This loss represents the cost to the broker-dealers of unwittingly providing the equity for the Unknown Trader Defendants to place the unauthorized trades in the intruded accounts. Moreover, the unauthorized trading caused damage to market participants who purchased the stocks subject to the intrusions at the artificially inflated prices.

88.    The current balance in the Parex omnibus account is approximately $17 million. In recent months, Parex has wired substantial sums form its omnibus account to an offshore account located in Riga, Latvia.

I make this declaration pursuant to 28 U.S.C. §1746 and declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information and belief.

DATED:  March 6, 2007

Thomas P. Conroy

- 20 -

# ATTACHMENT A

# DECLARATION OF JAMES AUTREY

I, James Autrey, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I make this Declaration of my personal knowledge and am competent to testify thereto.

2.      I am an adult resident of the Commonwealth of Virginia.

3.      I am employed as the Senior Manager of Corporate Security Investigations for E*TRADE Financial Corporation ("E*TRADE"). I have been employed by E*TRADE since 1996. My primary duties include managing internal and external corporate investigations. I have been employed in the securities industry since May 1993.

4.      E*TRADE is the indirect parent company of E*TRADE Securities LLC ("ETS"), which is a member broker-dealer of the National Association of Securities Dealers. E*TRADE's principal office is located in New York, New York.

5.      ETS customers are able to self-direct trades by accessing their brokerage accounts online. A customer can only access an ETS brokerage account online by entering a personalized username and password into the ETS website.

6.      When investigating potential unauthorized trading activity in a customer's account, an investigator from E*TRADE's Corporate Security Investigations ("CSI") typically will obtain a sixty (60) day Internet Protocol ("IP") address login history of the customer account and compare the IP addresses that accessed the account when there was no suspicious trading activity to the IP address that logged into the account at the time of the alleged unauthorized trading activity. Specifically, the investigator analyzes the IP address login history to determine whether the IP address in question is out-of-pattern in

that it originated from a different geographical area than the address on the account

registration or used a different Internet Service Provider than the prior IP addresses.

Finally, if additional information is needed from the customer to establish a login pattern,

the account holder is contacted by ETS Customer Service to obtain the relevant

information.

　　　7.　　　ETS has a brokerage account, number ███████, titled in the name of

███████████ ("████████ account"). On October 2, 2006, between 11:55

a.m. and 12:24 p.m. EST, the ███████k account was accessed and used to place orders

to purchase 12,800 shares of Repligen Corp. (Nasdaq: RGEN) at market prices.

　　　8.　　　On October 2, 2006, CSI determined that the trading of RGEN stock in the

████████k account was unauthorized. CSI made this determination in part by reviewing

the sixty (60) day IP login history of the account and confirming that the IP address used

to access the account on this date was out-of-pattern.

　　　9.　　　The unauthorized trades of RGEN stock in the ███████k account resulted in

an average loss per share of $.61, or approximately $7,808. ETS has restored this

account to the position it was in prior to the unauthorized trading activity.

　　　10.　　　ETS has a brokerage account, number ████████ titled in the name of ███████

██████hi ("██████ account"). On August 28, 2006, from 11:41 a.m. to 1:03 p.m. EST,

the ██████ account was accessed and used to place orders to purchase 138,000 shares of

Dura Automotive Systems, Inc. (Nasdaq: DRRA) at prices ranging from $.63 to $.68 per

share.

　　　11.　　　On August 29, 2006, CSI determined that the trading of DRRA stock in the

██████ account was unauthorized. CSI made this determination in part by reviewing the

sixty (60) day IP login history of the accounts and confirming that the IP addresses used to access the accounts on this date were out-of-pattern.

12.     The unauthorized trades of DRRA stock in the ███████account resulted in an average loss per share of $.26, or approximately $35,880. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

13.     ETS has a brokerage account, number ████████, titled in the name of ███████ ("████████account"). On August 28, 2006, from 12:57 p.m. to 1:50 p.m. EST, the ██████ account was accessed and used to place orders to purchase 93,000 shares of DRRA at prices ranging from $.63 to $.67 per share.

14.     On August 28, 2006, CSI determined that the trading of DRRA stock in the ████████ account was unauthorized. CSI made this determination in part by reviewing the sixty (60) day IP login history of the accounts and confirming that the IP addresses used to access the accounts on this date were out-of-pattern.

15.     The unauthorized trades of DRRA stock in the ████████ account resulted in an average loss per share of $.26, or approximately $24,180. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

16.     ETS has a brokerage account, number ████████, titled in the name of ███████ ████████ ("████████ account"). On July 28, 2006, between 11:41 a.m. and 1:04 p.m. EST, the ████████ account was accessed and used to place orders to purchase 154,699 shares of Valentis, Inc. (Nasdaq: VLTS) at prices ranging from $.59 to $.78 per share.

17.     On July 31, 2006, CSI determined that the purchases of VLTS stock in the ████████ account were unauthorized. CSI made this determination in part by

reviewing the sixty (60) day IP login history of the account and confirming that the IP

addresses used to access the account on this date were out-of-pattern.

18.    The unauthorized trades of VLTS stock in the ███████account resulted in

an average loss per share of $.26, or approximately $40,221.74. ETS has restored this

account to the position it was in prior to the unauthorized trading activity.

19.    ETS has a brokerage account, number██████, titled in the name of

███████ ("████ account"). On July 28, 2006, from 11:42 a.m. to

12:27 p.m. EST, the█████account was accessed and used to place orders to

purchase 86,000 shares of VLTS at prices ranging from $.65 to $.69 per share.

20.    On August 2, 2006, CSI determined that the purchases of VLTS stock in the

███████ account were unauthorized. CSI made this determination in part by

reviewing the sixty (60) day IP login history of the account and confirming that the IP

addresses used to access the account on this date were out-of-pattern.

21.    The unauthorized trades of VLTS stock in the█████ account resulted in

an average loss per share of $.26, or approximately $22,360. ETS has restored this

account to the position it was in prior to the unauthorized trading activity.

22.    ETS has a brokerage account, number██████, titled in the name of█████

█████ ("█████ account"). On July 17, 2006, between 3:34 p.m. and 3:43 p.m.

EST, the█████account was accessed and used to place orders to purchase 235,000

shares of WTS Dime Bancorp, Inc. (Nasdaq: DIMEZ) stock at prices ranging from $.22

to $.30 per share.

23.    On July 17, 2006, 2006, CSI determined that the purchases of DIMEZ stock in

the█████account were unauthorized. CSI made this determination in part by

reviewing the sixty (60) day IP login history of the account and confirming that the IP address that was used to access the account on this date was out-of-pattern.

24.    The unauthorized trades of DIMEZ stock in the ▮▮▮▮▮ account resulted in an average loss per share of $.03, or approximately $7,050. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

25.    ETS has a brokerage account, number ▮▮▮▮▮ titled in the name of ▮▮▮▮▮ ("▮▮▮ account"). On May 17, 2006, between 1:37 p.m. and 2:36 p.m. EST, the ▮▮▮ account was accessed and used to place orders to purchase 132,680 shares of Bluefly, Inc. (Nasdaq: BFLY) at prices ranging from $.82 to $1.38 per share.

26.    On May 18, 2006, CSI determined that the purchases of BFLY stock in the ▮▮▮▮ account were unauthorized. CSI made this determination in part by reviewing the sixty (60) day IP login history of the account and confirming that the IP address that was used to access the account on this date was out-of-pattern.

27.    The unauthorized trades of BFLY stock in the ▮▮▮▮ account resulted in an average loss per share of $.26, or approximately $34,496.80. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

28.    ETS has a brokerage account, number ▮▮▮▮▮ titled in the name of ▮▮▮▮▮ ("▮▮▮ account"). On April 13, 2006, between 12:19 p.m. and 1:05 p.m. EST, the ▮▮▮▮ account was accessed and used to place orders to purchase 2,630 shares of NetWolves Corp. (Nasdaq: WOLV) stock at prices ranging from $.39 to $.44 per share.

29.    On April 13, 2006, CSI determined that the purchases of WOLV stock in the ▮▮▮▮ account were unauthorized. CSI made this determination in part by reviewing

the sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

30.   The unauthorized trades of WOLV stock in the ▆▆▆▆ account resulted in an average loss per share of $.19, or approximately $499.70.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

31.   ETS has a brokerage account, number ▆▆▆▆ titled in the name of ▆▆▆▆ ▆▆▆▆ (▆▆▆▆ account").  On April 13, 2006, between 1:30 p.m. and 1:54 p.m. EST, the ▆▆▆▆ account was accessed and used to place orders to purchase 227,500 shares of WOLV stock at prices ranging from $.56 to $.57 per share.

32.   On April 17, 2006, CSI determined that the purchases of WOLV stock in the ▆▆▆▆ account were unauthorized.  CSI made this determination in part by reviewing the sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

33.   The unauthorized trades of WOLV stock in the ▆▆▆▆ account resulted in an average loss per share of $.19, or approximately $43,225.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

34.   ETS has a brokerage account, number ▆▆▆▆, titled in the name of ▆▆▆▆ ▆▆▆▆ ("▆▆▆▆ account").  On April 13, 2006, from 2:13 p.m. to 2:33 p.m. EST, the ▆▆▆▆ account was accessed and used to place orders to purchase 262,000 shares of WOLV at prices ranging from $.35 to $.57 per share.

35.   On April 17, 2006, CSI determined that the purchases of WOLV stock in the ▆▆▆▆ account were unauthorized.  CSI made this determination in part by reviewing the

sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

36.    The unauthorized trades of WOLV stock in the ████account resulted in an average loss per share of $.19, or approximately $49,780.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

37.    ETS has a brokerage account, number ████████ titled in the name of ████ ████████████ ("████account").  On April 13, 2006, from 12:57 p.m. to 1:15 p.m. EST, the ████account was accessed and used to place orders to purchase 49,200 shares of WOLV at $.44 per share.

38.    On April 13, 2006, CSI determined that the purchases of WOLV stock in the ████account were unauthorized.  CSI made this determination in part by reviewing the sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

39.    The unauthorized trades of WOLV stock in the ████account resulted in an average loss per share of $.19, or approximately $9,348.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

40.    ETS has a brokerage account, number ████████titled in the name of ████ ████████████ ("████account").  On April 13, 2006, from 1:22 p.m. to 1:40 p.m. EST, the ████account was accessed and used to place orders to purchase 225,600 shares of WOLV at prices ranging from $.49 to $.59 per share.

41.    On April 17, 2006, CSI determined that the purchases of WOLV stock in the ████account were unauthorized.  CSI made this determination in part by reviewing the

sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

42.    The unauthorized trades of WOLV stock in the███account resulted in an average loss per share of $.19, or approximately $42,864.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

43.    ETS has a brokerage account, number██████titled in the name of██████ ██████s ("██████account").  On April 13, 2006, from 1:53 p.m. to 2:33 p.m. EST, the██████account was accessed and used to place orders to purchase 212,700 shares of WOLV at prices ranging from $.39 to $.69 per share.

44.    On April 17, 2006, CSI determined that the purchases of WOLV stock in the ██████account were unauthorized.  CSI made this determination in part by reviewing the sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

45.    The unauthorized trades of WOLV stock in the██████account resulted in an average loss per share of $.19, or approximately $40,413.  ETS has restored this account to the position it was in prior to the unauthorized trading activity.

46.    ETS has a brokerage account, number██████, titled in the name of██████ ██████v ("██████account").  On April 13, 2006, from 12:23 p.m. to 1:11 p.m. EST, the ██████account was accessed and used to place orders to purchase 287,500 shares of WOLV at prices ranging from $.41 to $.49 per share.

47.    On April 13, 2006, CSI determined that the purchases of WOLV stock in the ██████accounts were unauthorized.  CSI made this determination in part by reviewing

the sixty (60) day IP login history of the account and confirming that the IP addresses that were used to access the account on this date were out-of-pattern.

48.    The unauthorized trades of WOLV stock in the ▓▓▓ account resulted in an average loss per share of $.19, or approximately $54,625. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

49.    ETS has a brokerage account, number ▓▓▓▓, titled in the name of a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ("▓▓▓▓▓▓ account"). On February 9, 2006, between 1:35 p.m. and 2:05 p.m. EST, the ▓▓▓▓▓ account was accessed and used to place orders to purchase 215,000 shares of Remote Dynamics, Inc. (Nasdaq: REDI) stock at prices ranging from $.52 to $.98 per share. On February 9, 2006 at 2:08 p.m., all 215,000 shares of REDI were sold at market prices.

50.    On February 9, 2006, CSI determined that the purchases of REDI stock in the ▓▓▓▓▓ account were unauthorized. CSI made this determination in part by reviewing the sixty (60) day IP login history of the account and confirming that the IP address that was used to access the account on this date was out-of-pattern.

51.    The unauthorized trades of REDI stock in the ▓▓▓▓▓ account resulted in an average loss per share of $.07, or approximately $15,050. ETS has restored this account to the position it was in prior to the unauthorized trading activity.

52.    E*TRADE has provided to the U.S. Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) account opening documents, (b) the Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _2/27_, 2007

_James Autrey_

ATTACHMENT B

DECLARATION OF ELLIS HOUGH

I, Ellis Hough, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I make this Declaration of my personal knowledge and am competent to testify thereto.

2.      I am an adult resident of the State of Missouri.

3.      I am employed by Scottrade, Inc. ("Scottrade") as the Manager of the Risk Management Department, whose primary function is to attempt to reduce financial losses at Scottrade.  As such, the department handles incidents of fraud or suspected fraud.

4.      I have been employed by Scottrade since March 1997.  My primary duty is managing the Risk Management Department.

5.      I have been employed in the securities industry since March 1992, and hold Series 63, 7 and 24 Registrations.

6.      Scottrade is a member broker-dealer of NASD.  Scottrade's principal office is located in St. Louis, Missouri.

7.      Scottrade customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online.  A Scottrade brokerage account can only be accessed online by entering into the website a personalized username and password that is assigned to each customer.

8.      Scottrade uses a variety of different methods for helping identify potential account intrusions or unauthorized trading activity.  These include reports and alerts regarding trading volumes in certain securities and low priced stocks being touted

through spam e-mails. If an account intrusion or unauthorized activity is suspected in an account, the Risk Management Department conducts an investigation. As part of the investigation, Scottrade reviews the Internet Protocol (IP) utilized in the subject account both before and at the time of the suspected intrusion.

9.    Scottrade holds an account number ███████, titled in the name of ████ ████████████████. On December 21, 2005, between 1:39:00 p.m. and 1:45:00 p.m. EST, the ███████ account was impermissibly accessed and used to purchase 43,000 shares of Tapestry Pharmaceuticals (Nasdaq: TPPH) stock at an average price of $.69 per share.

10.    On December 21, 2005, Scottrade's Risk Management Department determined that the purchases of TPPH stock in the ███████ account were unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ███████ account with the IP addresses used to place the questioned trades on December 21, 2005.

11.    The unauthorized purchases of TPPH stock in the ███████ account incurred a total cost of $29,670. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

12.    Scottrade holds an account number ███████, titled in the name of ███████ ████████████. On December 21, 2005, between 2:22:07 p.m. and 2:36:00 p.m. EST, the ███████ account was impermissibly accessed and used to purchase 77,000 shares of TPPH stock at an average price of $.55 per share.

13.    On December 21, 2005, Scottrade's Risk Management Department determined that the purchases of TPPH stock in the ███████ account were likely to be

unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ██████ account with the IP addresses used to place the questioned trades on December 21, 2005.

14.    The unauthorized purchases of TPPH stock in the ██████ account incurred a total cost of $42,350. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

15.    Scottrade holds an account number ██████ titled in the name of ██████ ██████. On December 21, 2005, between 12:45 p.m. and 1:24 p.m. EST, the ██████ account was impermissibly accessed and used to purchase 394,400 shares of TPPH stock at an average price of $.57 per share.

16.    On December 21, 2005, Scottrade's Risk Management Department determined that the purchases of TPPH stock in the ██████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ██████ account with the IP addresses used to place the questioned trades on December 21, 2005.

17.    The unauthorized purchases of TPPH stock in the ██████ account incurred a total cost of $223,749.42. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

18.    Scottrade holds an account number ██████ titled in the name of ██████ ██████. On December 21, 2005, between 3:32 p.m. and 3:49 p.m. EST, the ██████ account was impermissibly accessed and used to purchase 49,500 shares of BSML, Inc. (Nasdaq: BSML) stock at an average price of $1.25 per share.

19.     On December 21, 2005, Scottrade's Risk Management Department determined that the purchases of BSML stock in the ████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████ account with the IP addresses used to place the questioned trades on December 21, 2005.

20.     The unauthorized purchases of BSML stock in the ████ account incurred a total cost of $62,102.10. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

21.     Scottrade holds an account number ████ titled in the name of ████ ████. On December 21, 2005, between 2:42 p.m. and 3:24 p.m. EST, the ████ account was impermissibly accessed and used to purchase 318,388 shares of BSML stock at an average price of $1.16 per share.

22.     On December 21, 2005, Scottrade's Risk Management Department determined that the purchases of BSML stock in the ████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████ account with the IP addresses used to place the questioned trades on December 21, 2005.

23.     The unauthorized purchases of BSML stock in the ████ account incurred a total cost of $369,175.04. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

24.     Scottrade holds an account number ████ titled in the name of ████ ████. On February 9, 2006, between 1:16 p.m. and 1:21 p.m. EST, the ████ account

was impermissibly accessed and used to purchase 20,000 shares of Remote Dynamics,

Inc. (Nasdaq: REDI) stock at an average price of $.69 per share.

25.     On February 9, 2006, Scottrade's Risk Management Department determined

that the purchases of REDI stock in the ████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades

placed by the ████ account with the IP addresses used to place the questioned trades on

February 9, 2006.

26.     The unauthorized purcahses of REDI stock in the ████ account incurred a

total cost of $13,890.  Scottrade has restored the account to the position it was in prior to

the unauthorized trading activity.

27.     Scottrade holds an account number ████████ titled in the name of ████████

████████  On February 9, 2006, between 12:22 p.m. and 1:10 p.m. EST, the

████████ account was impermissibly accessed and used to purchase 221,000 shares of

REDI stock at an average price of $.62 per share.

28.     On February 9, 2006, Scottrade's Risk Management Department determined

that the purchases of REDI stock in the ████████ account were likely to be

unauthorized.  Scottrade made this determination in part by comparing IP addresses of

previous trades placed by the ████████ account with the IP addresses used to place the

questioned trades on February 9, 2006.

29.     The unauthorized purchases of REDI stock in the ████████ account incurred

a total cost of $136,650.  Scottrade has restored the account to the position it was in prior

to the unauthorized trading activity.

30.     Scottrade holds an account number ████████ titled in the name of ████████ ████████. On March 8, 2006, between 2:42 p.m. and 2:45 p.m. EST, the ████████ account was impermissibly accessed and used to purchase 10,500 shares of I-Many, Inc. (Nasdaq: IMNY) stock at an average price of $1.95 per share.

31.     On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ████████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████████ account with the IP addresses used to place the questioned trades on March 8, 2006.

32.     The unauthorized purchases of IMNY stock in the ████████ account incurred a total cost of $20,475.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

33.     Scottrade holds an account number ████████ titled in the name of ████████ ██ On March 8, 2006, between 2:23 p.m. and 2:27 p.m. EST, the ██ account was impermissibly accessed and used to purchase 12,500 shares of IMNY stock at an average price of $1.94 per share.

34.     On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ██ account were likely to be unauthorized.  Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ██ account with the IP addresses used to place the questioned trades on March 8, 2006.

35.    The unauthorized purchases of IMNY stock in the ███ account incurred a total cost of $24,249.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

36.    Scottrade holds an account number ████████, titled in the name of ████████ ████. On March 8, 2006, between 2:40 p.m. and 2:44 p.m. EST, the ████ account was impermissibly accessed and used to purchase 22,500 shares of IMNY stock at an average price of $1.95 per share.

37.    On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████ account with the IP addresses used to place the questioned trades on March 8, 2006.

38.    The unauthorized purchases of IMNY stock in the ████ account incurred a total cost of $43,862.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

39.    Scottrade holds an account number ████████, titled in the name of ████. ████ On March 8, 2006, between 2:56 p.m. and 3:03 p.m. EST, the ████ account was impermissibly accessed and used to purchase 31,000 shares of IMNY stock at an average price of $1.88 per share.

40.    On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ████ account were unauthorized.  Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████ account with the IP addresses used to place the questioned trades on March 8, 2006.

41.    The unauthorized trades of IMNY stock in the ███account incurred a total cost of $58,406.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

42.    Scottrade holds an account number ████titled in the name of ████ ██ On March 8, 2006, between 2:10 p.m. and 2:22 p.m. EST, the ██account was impermissibly accessed and used to purchase 59,500 shares of IMNY stock at an average price of $1.95 per share.

43.    On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ██account were likely to be unauthorized.  Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ██account with the IP addresses used to place the questioned trades on March 8, 2006.

44.    The unauthorized purchases of IMNY stock in the ██account incurred a total cost of $115,843.90.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

45.    Scottrade holds an account number ██████ titled in the name of █████ ████████.  On March 8, 2006, between 12:43 p.m. and 1:45 p.m. EST, the █████account was impermissibly accessed and used to purchase 97,300 shares of IMNY stock at an average price of $1.89 per share.

46.    On March 8, 2006, Scottrade's Risk Management Department determined that the purchases of IMNY stock in the ██████account were likely to be unauthorized.  Scottrade made this determination in part by comparing IP addresses of previous trades

placed by the Behrmann account with the IP addresses used to place the questioned trades on March 8, 2006.

47.    The unauthorized purchases of IMNY stock in the ██████████ account incurred a total cost of $183,748.97. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

48.    Scottrade holds an account number ██████████, titled in the name of ██████ ████. On April 13, 2006, between 1:00 p.m. and 1:10 p.m. EST, the ██████ account was impermissibly accessed and used to purchase 12,000 shares of NetWolves Corp. (Nasdaq: WOLV) stock at an average price of $0.44 per share.

49.    On April 13, 2006, Scottrade's Risk Management Department determined that the purchases of WOLV stock in the █████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the █████ account with the IP addresses used to place the questioned trades on April 13, 2006.

50.    The unauthorized purchases of WOLV stock in the █████ account incurred a total cost of $5,241. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

51.    Scottrade holds an account number ██████████ titled in the name of █████ ██████████. On April 13, 2006, between 12:26 p.m. and 12:41 p.m. EST, the ██████ ██████ was impermissibly accessed and used to purchase 43,300 shares of WOLV stock at an average price of $0.41 per share.

52.    On April 13, 2006, Scottrade's Risk Management Department determined that the purchases of WOLV stock in the █████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ███ account with the IP addresses used to place the questioned trades on April 13, 2006.

53.    The unauthorized purchases of WOLV stock in the ███ account incurred a total cost of $17,586.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

54.    Scottrade holds an account number ███, titled in the name of ███ ███.  On July 6, 2006, between 11:57 p.m. and 12:36 p.m. EST, the ███ account was impermissibly accessed and used to purchase 349,500 shares of WTS Dime Bancorp., Inc. (Nasdaq: DIMEZ) stock at an average price of $0.28 per share.

55.    On July 6, 2006, Scottrade's Risk Management Department determined that the purchases of DIMEZ stock in the ███ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ███ account with the IP addresses used to place the questioned trades on July 6, 2006.

56.    The unauthorized purchases of DIMEZ stock in the ███ account incurred a total cost of $99,278.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

57.    Scottrade holds an account number ███ titled in the name of ███ ███  On July 6, 2006, between 11:57 p.m. and 12:46 p.m. EST, the ███ account was impermissibly accessed and used to purchase 597,000 shares of DIMEZ stock at an average price of $0.29 per share.

58.    On July 6, 2006, Scottrade's Risk Management Department determined that the purchases of DIMEZ stock in the ████████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████████ account with the IP addresses used to place the questioned trades on July 6, 2006.

59.    The unauthorized purchases of DIMEZ stock in the ████████ account incurred a total cost of $170,443.90. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

60.    Scottrade holds an account number ████████, titled in the name of ████████ ████████. On July 28, 2006, between 11:28 a.m. and 11:55 a.m. EST, the ████████ account was impermissibly accessed and used to purchase 53,500 shares of Valentis, Inc. (Nasdaq: VLTS) stock at an average price of $0.59 per share.

61.    On July 28, 2006, Scottrade's Risk Management Department determined that the purchases of VLTS stock in the ████████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████████ account with the IP addresses used to place the questioned trades on July 28, 2006.

62.    The unauthorized purchases of VLTS stock in the ████████ account incurred a total cost of $31,567.50. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

63.    Scottrade holds an account number ████████, titled in the name of ████████ ████. On August 28, 2006, between 12:28 P.M. and 12:36 p.m. EST, the ████ account

was impermissibly accessed and used to purchase 65,000 shares of Dura Automotive

Systems, Inc. (Nasdaq: DRRA) stock at an average price of $0.60 per share.

64.    On August 28, 2006, Scottrade's Risk Management Department determined

that the purchases of DRRA stock in the ████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades

placed by the ████ account with the IP addresses used to place the questioned trades on

August 28, 2006.

65.    The unauthorized purchases of DRRA stock in the ████ account incurred a

total cost of $39,000.  Scottrade has restored the account to the position it was in prior to

the unauthorized trading activity.

66.    Scottrade holds an account number ████, titled in the name of ████

████.  On August 28, 2006, between 11:41 a.m. and 12:17 p.m. EST, the ████ account

was impermissibly accessed and used to purchase 70,000 shares of DRRA stock at an

average price of $0.60 per share.

67.    On August 28, 2006, Scottrade's Risk Management Department determined

that the purchases of DRRA stock in the ████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades

placed by the ████ account with the IP addresses used to place the questioned trades on

August 28, 2006.

68.    The unauthorized purchases of DRRA stock in the ████ account incurred a

total cost of $41,799.68.  Scottrade has restored the account to the position it was in prior

to the unauthorized trading activity.

69.     Scottrade holds an account number███████, titled in the name of██████ ███. On August 28, 2006, between 11:45 a.m. and 12:41 p.m. EST, the███account was impermissibly accessed and used to purchase 78,000 shares of DRRA stock at an average price of $0.60 per share.

70.     On August 28, 2006, Scottrade's Risk Management Department determined that the purchases of DRRA stock in the█████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the█████ account with the IP addresses used to place the questioned trades on August 28, 2006.

71.     The unauthorized purchases of DRRA stock in the█████ account incurred a total cost of $46,428.46. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

72.     Scottrade holds an account number███████, titled in the name of███████ ███. On August 28, 2006, between 11:41 a.m. and 12:21 p.m. EST, the███account was impermissibly accessed and used to purchase 124,000 shares of DRRA stock at an average price of $0.59 per share.

73.     On August 28, 2006, Scottrade's Risk Management Department determined that the purchases of DRRA stock in the█████account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the█████account with the IP addresses used to place the questioned trades on August 28, 2006.

74.    The unauthorized purchases of DRRA stock in the ████ account incurred a total cost of $73,689.93.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

75.    Scottrade holds an account number ████████ titled in the name of ██████ ██. On October 2, 2006, at 11:52 a.m. EST, the ████ account was impermissibly accessed and used to purchase 2,000 shares of Repligen Corp. (Nasdaq: RGEN) stock at an average price of $3.45 per share.

76.    On October 2, 2006, Scottrade's Risk Management Department determined that the purchases of RGEN stock in the ████ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ████ account with the IP addresses used to place the questioned trades on October 2, 2006.

77.    The unauthorized purchases of RGEN stock in the ████ account incurred a total cost of $6,900.  Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

78.    Scottrade holds an account number ████████ titled in the name of ████████ ████ On November 1, 2006, at 11:22 a.m. EST, the ████ account was impermissibly accessed and used to attempt a purchase 10,000 shares of iVow, Inc. (Nasdaq: IVOW). The trades did not execute because IVOW was restricted for online purchases at Scottrade.

79.    On November 1, 2006, Scottrade's Risk Management Department determined that the attempted purchases of IVOW stock in the ████ account were likely to be unauthorized.  Scottrade made this determination in part by comparing IP addresses of

previous trades placed by the ███ account with the IP addresses used to place the questioned trades on November 1, 2006.

80.    The attempted unauthorized purchases of IVOW stock in the ███ account incurred no monetary loss.

81.    Scottrade holds an account number ███, titled in the name of ███ ██. On November 15, 2006, between 11:03 a.m. and 12:35 p.m. EST, th██ ███ account was impermissibly accessed and used to purchase 100 shares of Orchid Cellmark, Inc. (Nasdaq: ORCH) stock at an average price of $3.80 per share.

82.    On November 15, 2006, Scottrade's Risk Management Department determined that the purchases of ORCH stock in the ███ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of previous trades placed by th██ ███ account with the IP addresses used to place the questioned trades on November 15, 2006.

83.    The unauthorized purchases of ORCH stock in the ███ account incurred a total cost of $380. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

84.    Scottrade holds an account number ███ titled in the name of ███ ██r. On November 15, 2006, between 11:02 a.m. and 11:50 a.m. EST, the ███ account was impermissibly accessed and used to purchase 4,900 shares of Orchid Cellmark, Inc. (Nasdaq: ORCH) stock at an average price of $3.90 per share.

85.    On November 15, 2006, Scottrade's Risk Management Department determined that the purchases of ORCH stock in the ███ account were likely to be unauthorized. Scottrade made this determination in part by comparing IP addresses of

previous trades placed by the ████ account with the IP addresses used to place the

questioned trades on November 15, 2006.

The unauthorized purchases of ORCH stock in the ████ account incurred a total cost of

$19,100. Scottrade has restored the account to the position it was in prior to the

unauthorized trading activity.

86.    Scottrade holds an account number ████████, titled in the name of ████████

████z. On December 4, 2006, between 1:28 p.m. and 1:35 p.m. EST, the ████ account

was impermissibly accessed and used to purchase 800 shares of DepoMed, Inc. (Nasdaq:

DEPO) stock at an average price of $3.59 per share.

87.    On December 4, 2006, Scottrade's Risk Management Department determined

that the purchases of DEPO stock in the ████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades

placed by the ████ account with the IP addresses used to place the questioned trades on

December 4, 2006.

88.    The unauthorized purchases of DEPO stock in the ████ account incurred a

total cost of $2,875. Scottrade has restored the account to the position it was in prior to

the unauthorized trading activity.

89.    Scottrade holds an account number ████████ titled in the name of ████████

████p. On December 4, 2006, between 1:27 p.m. and 1:57 p.m. EST, the ████ account

was impermissibly accessed and used to purchase 6,250 shares of DepoMed, Inc.

(Nasdaq: DEPO) stock at an average price of $3.61 per share.

90.    On December 4, 2006, Scottrade's Risk Management Department determined

that the purchases of DEPO stock in the ████ account were likely to be unauthorized.

Scottrade made this determination in part by comparing IP addresses of previous trades placed by the ▮▮▮ account with the IP addresses used to place the questioned trades on December 4, 2006.

91.   The unauthorized purchases of DEPO stock in the ▮▮▮ account incurred a total cost of $22,534. Scottrade has restored the account to the position it was in prior to the unauthorized trading activity.

92.   Although Scottrade concluded that it was not legally responsible for the losses sustained in the above accounts as a result of the unauthorized trades, Scottrade decided to restore the above referenced accounts to the position they were in prior to the fraud, for a full recovery to the Scottrade account holders of their losses. The total net loss to Scottrade resulting from the foregoing intrusions and Scottrade's efforts to make the customers whole was $341,249.93.

93.   Scottrade has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected customers' names, account numbers and contact information, (b) the unauthorized Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Feb 21, 2007

Ellis Hough

## ATTACHMENT C

## DECLARATION OF JAMES M. HEENEY

I, James M. Heeney, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I make this Declaration of my personal knowledge and am competent to testify thereto.

2.    I am an adult resident of the State of Nebraska.

3.    I am employed by TD Ameritrade, Inc. ("TD Ameritrade") as Managing Director, Compliance Operations.

4.    I have been employed by TD Ameritrade since February 9, 1998.  My primary duties include day-to-day management of TD Ameritrade's Client and Regulatory Relations.

5.    I have been employed in the securities industry since February 1998 and I hold Series 63, 7 and 24 Registrations.

6.    TD Ameritrade is a broker-dealer and member of the National Association of Securities Dealers.  Its principal office is located in Bellevue, Nebraska.

7.    TD Ameritrade customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online.  A TD Ameritrade brokerage account can only be accessed online by entering into the website a unique username and password that is assigned to each customer.

8.    TD Ameritrade has procedures reasonably designed to detect and prevent fraudulent or manipulative activity from occurring in client accounts.  TD Ameritrade Compliance and Fraud Analysts are responsible for the assessment of account activity to determine whether fraudulent or manipulative activity has occurred in an account.

9.    TD Ameritrade holds an account number ▮▮▮▮▮▮, titled in the name of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮i. On December 4, 2006, between 1:28 p.m. and 2:19 p.m. EST, based on our analysis it is our belief that the ▮▮▮▮ccount was accessed by one or more unauthorized persons and used to purchase 193,000 shares of DepoMed, Inc. (Nasdaq: DEPO) stock at prices ranging from $3.57 per share to $3.75 per share. The intruder(s) also sold a total of 103,000 shares at prices ranging from $3.12 to $3.44 per share.

10.    The unauthorized trades of DEPO stock in the ▮▮▮▮ account resulted in a loss of $84,075.92. TD Ameritrade has restored the ▮▮▮▮ account to the position it was in prior to the unauthorized trading activity.

11.    TD Ameritrade holds an account number ▮▮▮▮▮▮, titled in the name of ▮▮▮▮▮▮▮▮▮. On December 4, 2006, between 1:27 p.m. and 1:42 p.m. EST, based on our analysis it is our belief that the ▮▮▮▮▮▮▮ account was accessed by one or more unauthorized persons and used to purchase 9,200 shares of DEPO stock at prices ranging from $3.55 per share to $3.71 per share.

12.    The unauthorized trades of DEPO stock in the ▮▮▮▮▮▮▮▮ account resulted in a loss of $4,894.07. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

13.    TD Ameritrade holds an account number ▮▮▮▮▮▮, titled in the name of ▮▮▮▮▮▮▮▮a. On December 4, 2006, between 1:28 p.m. and 1:50 p.m. EST, based on our analysis it is our belief that the ▮▮▮▮account was accessed by one or more unauthorized persons and used to purchase 16,400 shares of DEPO stock at prices

ranging from $3.57 per share to $3.70 per share, and to sell all 16,400 shares of DEPO at prices ranging from $3.60 per share to $3.71 per share.

14.    The unauthorized trades of DEPO stock in the ███████ account resulted in a gain of $302.15.  TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

15.    TD Ameritrade holds an account number ████████, titled in the name of ████████r.  On December 4, 2006, at 2:12 p.m. EST, based on our analysis it is our belief that the ██████ account was accessed by one or more unauthorized persons and used to purchase 10,000 shares of DEPO stock at prices ranging from $3.52 per share to $3.57 per share.

16.    The unauthorized trades of DEPO stock in the ██████ account resulted in a loss of $6,040.61.  TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

17.    TD Ameritrade holds an account number ██████, titled in the name of ████████y.  On December 4, 2006, between 2:19 p.m. and 2:21 p.m. EST, based on our analysis it is our belief that the ██████ account was accessed by one or more unauthorized persons and used to purchase 18,000 shares of DEPO stock at prices ranging from $3.49 per share to $3.57 per share.

18.    The unauthorized trades of DEPO stock in the ██████ account resulted in a loss of $5,168.61.  TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

19.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of DEPO stock in the ██████, ██████, ██████, ██████ and ██████ accounts was

unauthorized. TD Ameritrade made this determination in part by interviewing the customers, analyzing how the account was accessed, and by the apparent manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

20.    TD Ameritrade holds an account number ███████8, titled in the name of ███████████████. On November 15, 2006, at 11:10 a.m. EST, based on our analysis it is our belief that the ████████ account was accessed by one or more unauthorized persons and used to purchase 1,000 shares of Orchid Cellmark, Inc. (Nasdaq: ORCH) stock at prices ranging from $3.94 per share to $3.95 per share.

21.    The unauthorized trades of ORCH stock in the ████████ account resulted in a loss of $338.92. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

22.    TD Ameritrade holds an account number ██████████), titled in the name of ████████████. On November 15, 2006, between 11:07 a.m. and 12:02 p.m. EST, based on our analysis it is our belief that the ██████ account was accessed by one or more unauthorized persons and used to purchase 11,500 shares of ORCH stock at prices ranging from $3.80 per share to $4.08 per share.

23.    The unauthorized trades of ORCH stock in the ██████ account resulted in a loss of $4,881.15. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

24.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of ORCH stock in the █████████ and ████████ accounts was unauthorized. TD Ameritrade

made this determination in part by interviewing the customers, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

25.    TD Ameritrade holds an account number ▮▮▮▮▮▮, titled in the name of ▮▮▮▮▮▮. On October 2, 2006, between 11:52 a.m. and 12:11 p.m. EST, based on our analysis it is our belief that the ▮▮▮ account was accessed by one or more unauthorized persons and used to purchase 27,000 shares of Repligen Corp. (Nasdaq: RGEN) stock at prices ranging from $3.45 per share to $4.10 per share.

26.    The unauthorized trades of RGEN stock in the ▮▮▮ account resulted in a loss of $12,267.41. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

27.    TD Ameritrade holds an account number ▮▮▮▮▮, titled in the name of ▮▮▮. On October 2, 2006, between 11:52 a.m. and 12:28 p.m. EST, based on our analysis it is our belief that the ▮▮▮ account was accessed by one or more unauthorized persons and used to purchase 180,500 shares of RGEN stock at prices ranging from $3.45 per share to $4.13 per share.

28.    The unauthorized trades of RGEN stock in the ▮▮▮ account resulted in a loss of $126,142.98. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

29.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of RGEN stock in the ▮▮▮ and ▮▮▮ accounts was unauthorized. TD Ameritrade made this determination in part by interviewing the customers, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

30.     TD Ameritrade holds an account number ███████, titled in the name of ███████████████ On August 28, 2006, between 12:42 p.m. and 3:39 p.m. EST, based on our analysis it is our belief that the ████████████ account was accessed by one or more unauthorized persons and used to purchase 363,500 shares of Dura Automotive Systems, Inc. (Nasdaq: DRRA, now DRRAQ) stock at prices ranging from $.59 per share to $.65 per share. The intruder(s) also sold 363,500 shares at $.484 per share.

31.     The unauthorized trades of DRRA stock in the ████████████ account resulted in a loss of $48,484.85. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

32.     TD Ameritrade's Fraud and Surveillance Department believes that the trading of DRRA stock in the ████████████ account was unauthorized. TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed and by the apparent manipulative nature of the trades.

33.     TD Ameritrade holds an account number ██████████, titled in the name of ██████████████. On July 28, 2006, between 11:50 a.m. and 1:01 p.m. EST, based on our analysis it is our belief that the ████████ account was accessed by one or more unauthorized persons and used to purchase 696,999 shares of Valentis, Inc. (Nasdaq: VLTS) stock at prices ranging from $.58 per share to $.67 per share.

34.     The unauthorized trades of VLTS stock in the ████████ account resulted in a loss of $125,054.72. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

35.    TD Ameritrade's Fraud and Surveillance Department believes that the purchases of VLTS stock in the ███████ account were unauthorized. TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

36.    TD Ameritrade holds an account number ███████ titled in the name of ███████████████ On March 24, 2006, between 2:22 p.m. and 2:56 p.m. EST, based on our analysis it is our belief that the ██████ account was accessed by one or more unauthorized persons and used to purchase 366,800 shares of Netguru, Inc. (Nasdaq: NGRU) stock at prices ranging from $.79 per share to $.85 per share.

37.    The unauthorized trades of NGRU stock in the ██████ account resulted in a loss of $118,170.86. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

38.    TD Ameritrade holds an account number ███████, titled in the name of ██████████ On March 24, 2006, between 1:27 p.m. and 3:44 p.m. EST, based on our analysis it is our belief that the ███████ account was accessed by one or more unauthorized persons and used to purchase 695,200 shares of NGRU stock at prices ranging from $.62 per share to $.95 per share, and to sell 694,800 shares of NGRU at prices ranging from $.57 per share to $.77 per share.

39.    The unauthorized trades of NGRU stock in the ██████ account resulted in a loss of $134,222.88. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

40.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of NGRU stock in the █████ and ██████ accounts was unauthorized. TD Ameritrade

made this determination in part by interviewing the customers, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

41. TD Ameritrade holds an account number ███████, titled in the name of ███████. On March 24, 2006, between 3:22 p.m. and 3:46 p.m. EST, based on our analysis it is our belief that the ███████ account was accessed by one or more unauthorized persons and used to purchase 165,000 shares of MIND CTI Ltd. (Nasdaq: MNDO) stock at prices ranging from $3.05 per share to $3.50 per share.

42. The unauthorized trades of MNDO stock in the ███████ account resulted in a loss of $38,094.36. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

43. TD Ameritrade's Fraud and Surveillance Department believes that the trading of MNDO stock in the ███████ account was unauthorized. TD Ameritrade made this determination in part by interviewing the customers, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

44. TD Ameritrade holds an account number ███████ titled in the name of ███████. On March 16, 2006, between 12:02 p.m. and 12:13 p.m. EST, based on our analysis it is our belief that the ███████ account was accessed by one or more unauthorized persons and used to purchase 40,000 shares of NetWolves Corp. (Nasdaq: WOLV) stock at prices ranging from $.36 per share to $.39 per share, and to sell all 40,000 shares of WOLV at $.36 per share.

45. The unauthorized trades of WOLV stock in the ███████ account resulted in a loss of $375.47. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

46.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of WOLV stock in the ▮▮▮▮account was unauthorized.  TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed, and by the apparent manipulative nature of the trades.

47.    TD Ameritrade holds an account number ▮▮▮▮▮▮, titled in the name of ▮▮▮▮▮t.  On March 16, 2006, between 12:00 p.m. and 12:57 p.m. EST, based on our analysis it is our belief that the ▮▮▮account was accessed by one or more unauthorized persons and used to purchase 87,000 shares of I-Many, Inc. (Nasdaq: IMNY) stock at prices ranging from $1.56 per share to $1.79 per share, and to sell all 87,000 shares of IMNY at prices ranging from $1.51 to $1.62.

48.    The unauthorized trades of IMNY stock in the ▮▮▮▮account resulted in a loss of $12,567.39.  TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

49.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of IMNY stock in the ▮▮▮▮ account was unauthorized.  TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed and by the apparent manipulative nature of the trades.

50.    TD Ameritrade holds an account number ▮▮▮▮▮ titled in the name of ▮▮▮▮▮.  On March 8, 2006, between 1:26 p.m. and 2:06 p.m. EST, based on our analysis it is our belief that the ▮▮▮▮account was accessed by one or more unauthorized persons and used to purchase 81,500 shares of I-Many, Inc. (Nasdaq: IMNY) stock at prices ranging from $1.85 per share to $1.98 per share.

- 9 -

51.    The unauthorized trades of IMNY stock in the ███████ account resulted in a loss of $32,045.26. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

52.    TD Ameritrade's Fraud and Surveillance Department believes that the purchases of IMNY stock in the ██████ account were unauthorized. TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed and by the apparent manipulative nature of the trades.

53.    TD Ameritrade holds an account number ████████, titled in the name of ████████. On February 17, 2006, between 1:22 p.m. and 2:00 p.m. EST, based on our analysis it is our belief that the ███████ account was accessed by one or more unauthorized persons and used to purchase 234,890 shares of Integrated Alarm Services Group, Inc. (Nasdaq: IASG) stock at prices ranging from $3.67 per share to $4.27 per share, and to sell 67,324 shares of IASG at prices ranging from $4.11 per share to $4.20 per share.

54.    The unauthorized trades of IASG stock in the ███████account resulted in a loss of $107,164.25. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

55.    TD Ameritrade's Fraud and Surveillance Department believes that the trading of IASG stock in the ██████ account was unauthorized. TD Ameritrade made this determination in part by interviewing the customer, analyzing how the account was accessed and by the apparent manipulative nature of the trades.

56.    TD Ameritrade holds an account number ████████ titled in the name of ████████ On February 9, 2006, between 12:29 p.m. and 12:51 p.m. EST, based

on our analysis it is our belief that the ███ account was accessed by one or more

unauthorized persons and used to place orders to purchase 243,900 shares of Remote

Dynamics, Inc. stock (Nasdaq: REDI). The orders were busted and reversed by TD

Ameritrade.

57. TD Ameritrade's Fraud and Surveillance Department believes that the

attempted purchases of REDI stock in the ███ account were unauthorized. TD

Ameritrade made this determination in part by interviewing the customer, analyzing how

the account was accessed and by the apparent manipulative nature of the trades.

58. TD Ameritrade holds an account number ███, titled in the name of

███ On December 21, 2005, between 2:11 p.m. and 2:15 p.m. EST, based

on our analysis it is our belief that the ███ account was accessed by one or more

unauthorized persons and used to purchase 27,500 shares of Tapestry Pharmaceuticals,

Inc. (Nasdaq: TPPH) stock at prices ranging from $.56 per share to $.59 per share.

59. The unauthorized trades of TPPH stock in the ███ account resulted in a

loss of $3,331.08. TD Ameritrade has restored the account to the position it was in prior

to the unauthorized trading activity.

60. TD Ameritrade holds an account number ███ titled in the name of

███ On December 21, 2005, between 1:14 p.m.

and 1:59 p.m. EST, based on our analysis it is our belief that the ███ account was

accessed by one or more unauthorized persons and the intruder(s) placed orders to buy

134,100 shares of TPPH stock at prices ranging from $.58 to $.69 per share. The

purchase price of the TPPH shares was later adjusted to $.50 per share by a market

maker.

61.    The unauthorized trades of TPPH stock in the ███████ account resulted in a loss of $25,145.18.  TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

62.    TD Ameritrade's Fraud and Surveillance Department believes that the purchases and attempted purchases of TPPH stock in the ███████ and ███████ accounts were unauthorized.  TD Ameritrade made this determination in part by interviewing the customers, analyzing how the account was accessed and by the apparent manipulative nature of the trades.

63.    The total net loss to TD Ameritrade resulting from the foregoing intrusions and TD Ameritrade's efforts to make the customers whole amounts to $967,740.04.

64.    TD Ameritrade has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected customers' account numbers and account opening documents, (b) the manner in which the accounts were accessed, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____/6___, 2007

James M. Heeney

PRIVILEGED AND CONFIDENTIAL

## ATTACHMENT D

## DECLARATION OF MARK STEWART

I, Mark Stewart, declare as follows:

1.　　I make this Declaration of my personal knowledge and am competent to testify thereto.

2.　　I am an adult resident of the State of California.

3.　　I am employed by Charles Schwab & Co., Inc. ("Schwab") as Vice President, Loss Prevention and Fraud.

4.　　I have been employed by Schwab since June 1992. My primary duties include the supervision of fraud investigation activities.

5.　　Schwab is a member broker-dealer of the National Association of Securities Dealers. Its principal office is located in San Francisco, California.

6.　　Schwab customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online. A Schwab brokerage account can only be accessed online by entering into the website a unique username and password that is assigned to each customer.

7.　　In regards to Computer Intrusions, Schwab's Risk Management &

Investigations Department (RM&I) and Trading Operation's Electronic Order Review

Department (EOR) work together to determine whether fraudulent or manipulative

activity has occurred in an account. Schwab uses a variety of methods, including, but not

limited to, data obtained from Internet Protocol ("IP") address monitoring, identification

of trades out of the client's normal trading pattern, information sharing among other

brokerage firms, the monitoring of spam e-mails, and inquiries from clients. Regardless

of how the transaction was conducted or attempted to be conducted, Schwab requires

direct confirmation from the client in order to confirm fraudulent trading activity.

    8.    Schwab holds an account number ██████, titled in the name of ██████
████████████. On December 4, 2006, at 2:09 p.m. EST, the ██████ account was
impermissibly accessed and used to place an order to purchase 6,000 shares of DepoMed,
Inc. (Nasdaq: DEPO) stock. The order was cancelled by Schwab prior to execution.

    9.    Schwab holds an account number ██████, titled in the name of ██████
██████ On December 4, 2006, at 2:01 p.m. EST, the ██████ account was impermissibly
accessed and used to purchase 10,000 shares of DEPO stock at prices ranging from $3.76
per share to $3.79 per share. Between 2:02 pm and 2:05 p.m., an additional 30,000
shares were purchased in the account at prices ranging from $3.76 per share to $3.77 per
share. Additionally, at 2:06 p.m., an order to purchase 10,000 shares of DEPO was
placed in the account, but the order was cancelled by Schwab prior to execution.

    10.    The unauthorized trades of DEPO stock in the ██████ accounts resulted in a

loss of $8,088.97. Schwab has restored the ████ accounts to the position they were in prior to the unauthorized trading activity.

11.    Schwab holds an account number ████ titled in the name of ████ ████ On December 4, 2006, between 1:28 p.m. and 2:07 p.m. EST, the ████ account was impermissibly accessed and used to purchase 44,100 shares of DEPO stock at prices ranging from $3.58 per share to $3.78 per share. Additionally, between 2:10 p.m. and 2:19 p.m., two orders to purchase a total of 5,600 shares of DEPO were placed in the account, but the orders were cancelled by Schwab prior to execution.

12.    The unauthorized trades of DEPO stock in the ████ account resulted in a loss of $18,812.39. Schwab has restored the ████ account to the position it was in prior to the unauthorized trading activity.

13.    Schwab holds an account number ████ titled in the name of ████ ████. On December 4, 2006, between 1:27 p.m. and 2:08 p.m. EST, the ████ account was impermissibly accessed and used to purchase 64,500 shares of DEPO stock at prices ranging from $3.54 per share to $3.79 per share. Additionally, between 2:10 p.m. and 2:15 p.m., two orders to purchase a total of 6,900 shares of DEPO were placed in the account, but the orders were cancelled by Schwab prior to execution.

14.    The unauthorized trades of DEPO stock in the ████ account resulted in a loss of $44,246.77. Schwab has restored the ████ account to the position it was in prior to the unauthorized trading activity.

15.    Schwab holds an account number ▓▓▓▓▓ titled in the name of ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓.  On December 4, 2006, between 1:38 p.m. and 1:52 p.m. EST, the ▓▓▓▓ account was impermissibly accessed and used to purchase 14,500 shares of DEPO stock at prices ranging from $3.59 per share to $3.73 per share.  Additionally, at 1:55 p.m., an order to purchase 15,000 shares of DEPO was placed in the account, but the order was cancelled by Schwab prior to execution.

16.    The unauthorized trades of DEPO stock in the ▓▓▓▓▓ account resulted in a loss of $3,563.18.  Schwab has restored the ▓▓▓▓▓ account to the position it was in prior to the unauthorized trading activity.

17.    Schwab's Risk Management and Investigations Department has determined that the purchases of DEPO stock in the ▓▓▓▓, ▓▓▓▓▓, ▓▓▓▓▓, ▓▓▓▓ accounts were unauthorized.  Schwab made this determination in part by interviewing the customers, comparing the IP addresses of previous trades placed by the customers with the IP addresses used to place the questioned trades on December 4, 2006, and by the manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

18.    Schwab holds an account number ▓▓▓▓▓ titled in the name of ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓.  On November 15, 2006, between 11:01 a.m. and 12:17 p.m. EST, the ▓▓▓▓ account was impermissibly accessed and used to purchase 171,000 shares

of Orchid Cellmark, Inc. (Nasdaq: ORCH) stock at prices ranging from $3.73 per share to $4.08 per share.

19.    The unauthorized trades of ORCH stock in the ███████ account resulted in a loss of $83,503.65. Schwab has restored the ███████ account to the position it was in prior to the unauthorized trading activity.

20.    Schwab's Risk Management and Investigations Department has determined that the purchases of ORCH stock in the ███████ account were unauthorized. Schwab made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on November 15, 2006, and by the manipulative nature of the trades.

21.    Schwab holds an account number ███████ titled in the name of ███████ ███████ On November 1, 2006, at 11:53 a.m. EST, the ███████ account was impermissibly accessed and used to place an order to purchase 2,000 shares of iVow, Inc. (Nasdaq: IVOW) stock at $1.35 per share. The order was cancelled by Schwab prior to execution.

22.    In addition, Schwab holds an account number ███████, titled in the name of ███████████████████s. On November 1, 2006, at 11:39 a.m. EST, the ███████ account was impermissibly accessed and used to place an order to purchase 1,000 shares of IVOW stock at $1.35 per share. The order was cancelled by Schwab prior to execution.

23.    Schwab's Risk Management and Investigations Department has determined that the purchases of IVOW stock in the ███████ and ███████ accounts were unauthorized.

24.    Schwab made this determination in part by interviewing the customers, comparing the IP addresses of previous trades placed by the customers with the IP addresses used to place the questioned trades on November 1, 2006, and by the manipulative nature of the trades.

25.    Schwab holds an account number ███████, titled in the name of ███████ ███. On October 2, 2006, between 12:05 p.m. and 12:28 p.m. EST, the ███████ account was impermissibly accessed and used to purchase 64,500 shares of Repligen Corp. (Nasdaq: RGEN) stock at prices ranging from $3.83 per share to $4.17 per share. Additionally, at 12:30 p.m., an order to purchase 20,000 shares of RGEN was placed in the account, but the order was cancelled by Schwab prior to execution.

26.    The unauthorized trades of RGEN stock in the ███████ account resulted in a loss of $46,003.20.  Schwab has restored the ███████ account to the position it was in prior to the unauthorized trading activity.

27.    Schwab holds an account number ███████, titled in the name of ███████ ███. On October 2, 2006, at 10:24 a.m. EST, the ███ account was impermissibly accessed and the intruder(s) sold 300 shares of Oracle stock at $17.81 per share. Between 11:54 a.m. and 12:06 p.m., a total of 19,000 shares of RGEN stock were purchased in the account at prices ranging from $3.83 per share to $4.17 per share. Additionally, between 12:08 p.m. and 12:37 p.m., eighteen additional orders were placed in the account to purchase a total of 71,000 shares of RGEN, but the orders were cancelled by Schwab prior to execution.

28.    The unauthorized trades of RGEN stock in the ▮▮ account resulted in no

loss. Schwab has restored the ▮▮▮ account to the position it was in prior to the

unauthorized trading activity.

29.    Schwab holds an account number ▮▮▮▮▮, titled in the name of ▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On October 2, 2006, between 11:52 a.m. and 12:21

p.m. EST, the ▮▮▮▮▮ account was impermissibly accessed and used to purchase

41,000 shares of RGEN stock were purchased in the account at prices ranging from $3.45

per share to $4.09 per share. Additionally, between 12:22 p.m. and 12:30 p.m., four

additional orders were placed in the account to purchase a total of 17,000 shares of

RGEN, but the orders were not executed. At 12:23 p.m., a total of 4,000 shares were sold

in the account at $3.90 per share.

30.    The unauthorized trades of RGEN stock in the ▮▮▮▮▮ account resulted in a

loss of $23,489.88. Schwab has restored the ▮▮▮▮▮ account to the position it was in

prior to the unauthorized trading activity.

31.    Schwab's Risk Management and Investigations Department has determined

that the purchases of RGEN stock in the ▮▮▮▮▮ and ▮▮▮▮▮ accounts were

unauthorized. Schwab made this determination in part by interviewing the customers,

comparing the IP addresses of previous trades placed by the customers with the IP

addresses used to place the questioned trades on October 2, 2006, and by the

manipulative nature of the trades.

32.    Schwab holds an account number ▮▮▮▮▮ titled in the name of ▮▮▮▮▮

▮▮. On August 28, 2006, at between 2:33 p.m. and 2:50 p.m. EST, the ▮▮▮▮ account

33.    was impermissibly accessed and used to purchase 30,000 shares of Dura

Automotive Systems, Inc. (Nasdaq: DRRA) stock at prices ranging from $.59 per share to

$.60 per share. Additionally, at 2:59 p.m., an order was placed in the account to purchase

25,000 shares of DRRA, but the order was cancelled by Schwab prior to execution.

34.    The unauthorized trades of DRRA stock in the████account resulted in a loss

of $1,272.70. Schwab has restored th██████account to the position it was in prior to the

unauthorized trading activity.

35.    Schwab's Risk Management and Investigations Department has determined

that the purchases of DRRA stock in the████account were unauthorized. Schwab made

this determination in part by interviewing the customer, comparing the IP addresses of

previous trades placed by the customer with the IP addresses used to place the questioned

trades on August 28, 2006, and by the manipulative nature of the trades.

36.    Schwab holds an account number████████ titled in the name of████████

████████████████████████████████. On July 28, 2006,

between 12:13 p.m. and  12:17 p.m. EST, the███████account was impermissibly

accessed and used to purchase 35,000 shares of Valentis, Inc. (Nasdaq: VLTS) stock at

prices ranging from $.63 per share to $.67 per share.

37.    The unauthorized trades of VLTS stock in the████account resulted in a

loss of $1,592.00. Schwab has restored the████account to the position it was in prior

to the unauthorized trading activity.

38.    Schwab's Risk Management and Investigations Department has determined

that the purchases of VLTS stock in the████account were unauthorized. Schwab

made this determination in part by interviewing the customer, comparing the IP addresses

of previous trades placed by the customer with the IP addresses used to place the

questioned trades on July 28, 2006, and by the manipulative nature of the trades.

39.    Schwab holds an account number ███████ titled in the name of ███████

█████████████. On March 8, 2006, at 2:11 p.m. EST, the ███████

account was impermissibly accessed and used to purchase 5,000 shares of I-Many, Inc.

(Nasdaq: IMNY) stock at prices ranging from $1.91 per share to $1.92 per share.

40.    The unauthorized trades of IMNY stock in the ███████ account resulted

in a loss of $176.00. Schwab has restored the ███████ account to the position it

was in prior to the unauthorized trading activity.

41.    Schwab holds an account number ███████ titled in the name of ███████

█████████████. On March 8, 2006, between 1:19 p.m. and 1:59

p.m. EST, the ███████ account was impermissibly accessed and used to purchase

113,610 shares of IMNY stock at prices ranging from $1.83 per share to $2.08 per share.

42.    The unauthorized trades of IMNY stock in the ███████ account resulted

in a loss of $13,682.55. Schwab has restored the ███████ account to the position it

was in prior to the unauthorized trading activity.

43.    Schwab's Risk Management and Investigations Department has determined

that the purchases of IMNY stock in the ███████ accounts were unauthorized. Schwab

made this determination in part by interviewing the customer, comparing the IP addresses

of previous trades placed by the customer with the IP addresses used to place the

questioned trades on March 8, 2006, and by the manipulative nature of the trades.

44.    The total net loss to Schwab resulting from the foregoing intrusions and

Schwab's efforts to make the customers whole was $244,431.29. This figure includes the

buyback of existing positions sold from the intruded accounts to effect the fraudulent

purchases.

45.    Schwab has provided to the Securities and Exchange Commission records

relating to the unauthorized trades, including, but not limited to: (a) the affected

customers' account numbers and account opening documents, (b) the unauthorized

46.    Internet Protocol addresses used to access each of the accounts, and (c)

detailed order information for the underlying trades.


I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.



Executed on February 15, 2007

Mark Stewart
Vice President,
Loss Prevention & Fraud
Charles Schwab & Co. Inc.

**ATTACHMENT E**

**DECLARATION OF EDWARD MOORE**

I, Edward Moore, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I make this Declaration of my personal knowledge and am competent to testify thereto.

2.      I am an adult resident of the Commonwealth of Massachusetts.

3.      I am employed by Fidelity Brokerage Services LLC ("FBS") as a Senior Vice President. Fidelity Investments is not a legal entity.  Rather, it is a registered servicemark used by a family of companies which are directly or indirectly owned or controlled in whole or in part by FMR Corp.  The family of companies is commonly referred to as Fidelity Investments.

4.      I have been employed by FBS since July 5, 2005.  Prior to July 5, 2005 I was employed by another of the Fidelity companies.  Currently, I am a senior vice president with FBS, and my primary duties include general risk management oversight for Fidelity's brokerage business.

5.      FBS is a member broker-dealer of the National Association of Securities Dealers and the New York Stock Exchange. Its principal office is located in Boston, Massachusetts.

6.      FBS customers are able to place orders to purchase or sell securities in their accounts in a number of ways, including by accessing their brokerage accounts online.  A Fidelity brokerage account can be accessed online by entering into the website either a

unique username and password that is established by each customer or the customer's social security number and unique personal identification number.

7.       FBS accounts are monitored to evaluate, among other things, whether fraudulent or manipulative activity may have occurred in an account. As part of this process, The FBS Risk Management Group is responsible for restricting access to compromised accounts, working with compromised customers to re-establish account credentials, as well as educating customers on the nature of the compromises and the steps they may take to protect themselves and their accounts.

8.       ████████ is the registered owner of account number ████████ held with FBS (the "████ account"). On December 4, 2006, between 1:27 p.m. and 1:54 p.m. EST, it appears that the ████ account was accessed without ████████ permission, and was used to purchase 24,300 shares of DepoMed, Inc. (Nasdaq: DEPO) stock at prices ranging from $3.55 per share to $3.67 per share.

9.       The unauthorized trades of DEPO stock in the ████ account resulted in a loss of $3,444.02. Fidelity has restored the account to the position it was in prior to the unauthorized trading activity, and as a result, ████████ has suffered no losses.

10.      ████████ is the registered owner of account number ████████ held with FBS (the ████ account"). On December 4, 2006, between 1:28 p.m. and 1:57 p.m. EST, it appears that the ████ account was accessed without ████████ permission, and was used to purchase 34,900 shares of DEPO stock at prices ranging from $3.59 per share to $3.78 per share.

11.    The unauthorized trades of DEPO stock in the ▮▮▮▮▮ account resulted in a loss of $19,451.45. Fidelity has restored the account to the position it was in prior to the unauthorized trading activity, and as a result, ▮▮▮▮▮▮▮ has suffered no losses.

12.    ▮▮▮▮▮▮▮▮▮▮ is the registered owner of account number ▮▮▮▮▮▮▮ held with FBS (the "▮▮▮▮ account"). On December 4, 2006, at 1:34 p.m. EST, the ▮▮▮▮ account was impermissibly accessed and used to place an order to purchase 7,000 shares of DEPO stock at the market which was Last $3.60, Bid $3.58, and Ask $3.60. Due to insufficient cash in the customer's account, the order was not executed.

13.    ▮▮▮▮▮▮y is the registered owner of account number ▮▮▮▮▮▮▮ held with FBS (the "▮▮▮▮ account"). On December 4, 2006, at 2:20 p.m. EST, the ▮▮▮▮ account was impermissibly accessed and used to place an order to purchase 4,000 shares of DEPO stock at the market which was Last $3.45, Bid $3.54, and Ask $3.55. Due to insufficient cash in the customer's account, the order was not executed.

14.    Based on Fidelity's investigation, which included interviewing the customers, and comparing the internet access of previous trades placed by the customers with the internet access used to place the questioned trades on December 4, 2006, Fidelity believes that the purchases of DEPO stock in the ▮▮▮▮, ▮▮▮▮, ▮▮▮▮ and ▮▮▮▮ accounts were unauthorized.

15.    ▮▮▮▮▮▮▮▮ is the registered owner of account number ▮▮▮▮▮▮ held with FBS (the "▮▮▮▮ account"). On October 2, 2006, at 11:59 a.m. EST, it appears that the ▮▮▮▮ account was accessed without ▮▮▮▮▮▮▮ permission, and was used to purchase 2,000 shares of Repligen Corp. (Nasdaq: RGEN) stock at prices ranging from $3.59 per share to $3.68 per share.

16.    The unauthorized trades of RGEN stock in the ████ account resulted in a loss of $960.00.  Fidelity has restored the account to the position it was in prior to the unauthorized trading activity, and as a result, ████████ has suffered no losses.

17.    Based on Fidelity's investigation, which included interviewing customers and comparing the internet access of previous trades placed by the customer with the internet access used to place the questioned trades on October 2, 2006, Fidelity believes the purchases of RGEN stock in the ████ account were unauthorized.

18.    ████████████████████ are the registered owners of account number ████████, held with FBS (the "████ account").  On April 13, 2006, between 12:28 p.m. and 12:58 p.m. EST, it appears that the ████ account was accessed without the Martins' permission, and was used to place orders to purchase 514,300 shares of NetWolves Corp. (Nasdaq: WOLV) stock at prices ranging from $.38 per share to $.47 per share.  Orders for a total of 350,300 shares were executed by Fidelity.

19.    The unauthorized trades of WOLV stock in the ████ account resulted in a loss of $13,386.  Fidelity has restored the account to the position it was in prior to the unauthorized trading activity, and as a result, the ████ suffered no losses.

20.    Based on Fidelity's investigation, which included interviewing customers and comparing the internet access of previous trades placed by the customer with the internet access used to place the questioned trades on April 13, 2006, Fidelity believes that the trading of WOLV stock in the ████ account was unauthorized.

21.    The total net loss to Fidelity resulting from the foregoing intrusions and Fidelity's making the customers whole was $37,241.47.  This figure includes the buyback of positions sold from the accounts to effectuate the fraudulent purchases.

22.    Fidelity has provided to the Securities and Exchange Commission records relating to the unauthorized trades described above, including, but not limited to: (a) the affected customers' account numbers and account opening documents, (b) the unauthorized Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 7, 2007

Edward Moore

**ATTACHMENT F**

**DECLARATION OF RICHARD L. MANDEL**

I, Richard L. Mandel, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I make this Declaration of my personal knowledge and am competent to testify thereto.

2.    I am an adult resident of the State of New York.

3.    I am employed by Merrill Lynch & Co., Inc. ("Merrill Lynch") as Vice President and Chief Investigator of the Merrill Lynch Fraud Unit.

4.    I have been employed by Merrill Lynch since 1995. My primary duties include the investigation of potential fraud against Merrill Lynch and/or the clients of Merrill Lynch

5.    Merrill Lynch is a member broker-dealer of the National Association of Securities Dealers. Its principal office is located in New York, New York.

6.    Merrill Lynch customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online. A Merrill Lynch brokerage account can only be accessed online by entering into the website a unique username and password that is assigned to each customer.

7.    Merrill Lynch's Fraud Investigation Unit ("MLFIU") is responsible for, among other things, the assessment of account activity to determine whether fraudulent activity, including unauthorized access, has occurred in an account. The MLFIU investigators monitor for activity resulting from unauthorized access using a multi-method approach, including, but not limited to: (i) data obtained from Internet Protocol

("IP") address monitoring, (ii) information sharing among other brokerage firms, (iii) identifying trades out of the client's normal pattern, (iv) alerts from market centers and regulators, (v) the monitoring of spam e-mails, and (vi) inquiries from clients.

8.      Once a security symbol is identified as being involved in unauthorized trading, the investigator will, among other things, review the thirty day IP login history of the account to confirm that the IP addresses used to access the account on this date was out-of-pattern, interview the customer and with them review their account(s) for unauthorized access and/ or fraudulent activity.

9.      Merrill Lynch holds an account number ▉▉▉▉▉, titled in the name of ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉. On March 8, 2006, between 12:46 pm and 1:49 pm EST, the ▉▉▉▉ account was impermissibly accessed and used to purchase 10,000 shares of I-Many, Inc. (Nasdaq: IMNY) stock at prices ranging from $1.97 per share to $2.00 per share.

10.     The unauthorized purchases of IMNY stock in the ▉▉▉▉ account resulted in a loss of $5,000. Merrill Lynch has restored the account to the position it was in prior to the unauthorized trading activity.

11.     Merrill Lynch holds an account number ▉▉▉▉▉, titled in the name of ▉▉▉▉▉▉ On March 8, 2006, between 12:50 pm and 2:55 pm EST, the ▉▉▉▉ account was impermissibly accessed and used to purchase 107,900 shares of IMNY stock at prices ranging from $1.94 per share to $2.02 per share.

12.     The unauthorized trades of IMNY stock in the ▉▉▉▉ account resulted in a loss of $61,102.38. Merrill Lynch has restored the account to the position it was in prior to the unauthorized trading activity.

13.     Merrill Lynch has determined that the purchases of IMNY stock in the ███████ and ███████ accounts were unauthorized.  Merrill Lynch made this determination in part by interviewing the customers, comparing the IP addresses of previous trades placed by the customers with the IP addresses used to place the questioned trades on March 8, 2006, and by the manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

14.     Merrill Lynch holds an account number ███████ titled in the name of ███████.  On February 17, 2006, between 11:50 am and 3:15 pm EST, the ███████ account was impermissibly accessed and used to purchase 26,900 shares of Integrated Alarm Services Group, Inc. (Nasdaq: IASG) stock at prices ranging from $3.84 per share to $4.10 per share.

15.     The unauthorized trades of IASG stock in the ███████ account resulted in a loss of $25,000.  Merrill Lynch has restored the account to the position it was in prior to the unauthorized trading activity.

16.     Merrill Lynch has determined that the purchases of IASG stock in the ███████ account were unauthorized.  Merrill Lynch made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on February 17, 2006, and by the manipulative nature of the trades.

17.     Merrill Lynch holds an account number ███████, titled in the name of ███████.  On December 21, 2005, between 10:15 am and 11:04 am EST, the ███████ account was impermissibly accessed and used to purchase 24,000

shares of Onvia, Inc. (Nasdaq: ONVI) stock at prices ranging from $4.30 per share to $5.19 per share.

18.     The unauthorized trades of ONVI stock in the ▮▮▮▮▮ account resulted in a loss of $14,081.74.  Merrill Lynch has restored the account to the position it was in prior to the unauthorized trading activity.

19.     Merrill Lynch has determined that the purchases of ONVI stock in the ▮▮▮▮▮ account were unauthorized.  Merrill Lynch made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on December 21, 2005, and by the manipulative nature of the trades.

20.     The total net loss to Merrill Lynch resulting from the foregoing intrusions and Merrill Lynch's efforts to make the customers whole amounts to $ 105,184.12.  This figure includes the buyback of existing positions sold from the intruded accounts to effectuate the fraudulent purchases.

21.     Merrill Lynch has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected customers' account numbers and contact information, (b) the unauthorized Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _02/07_, 2007

Richard L. Mandel

PRIVILEGED AND CONFIDENTIAL

## ATTACHMENT G

## DECLARATION OF PAULINE C. SCALVINO

I, Pauline C. Scalvino, pursuant to 28 U.S.C. §1746, declare as follows:

1.      I make this Declaration of my personal knowledge and am competent to testify thereto.

2.      I am an adult resident of the Commonwealth of Pennsylvania.

3.      I am employed by The Vanguard Group, Inc. and am the Chief Compliance Officer of Vanguard Marketing Corporation ("VMC").

4.      I have been employed by The Vanguard Group, Inc. since September 1996 and have served as Chief Compliance Officer of VMC since September 2006.  I have served as Chief Compliance Officer of the Vanguard funds and The Vanguard Group, Inc., a federally registered investment adviser, since April 2006.  My primary duties include responsibility for the Vanguard Compliance Department, which oversees and monitors compliance with the various laws, rules and regulations applicable to Vanguard's and its subsidiaries' businesses.

5.      VMC is a wholly owned subsidiary of The Vanguard Group, Inc. and is a member broker-dealer of the National Association of Securities Dealers.  VMC's principal office is located in Malvern, Pennsylvania.

6.      Vanguard Brokerage Services ("VBS") is a division of VMC.  VBS clients may elect to register for online access to their VBS brokerage accounts and are then able to place orders to purchase or sell securities by accessing their accounts via

www.vanguard.com. Online access requires the use of a unique user name and password that is selected by each client who elects to register for online access.

7. VMC uses a variety of methods to detect and prevent unauthorized and fraudulent online account activity. Those methods include, but are not limited to, monitoring Internet Protocol ("IP") addresses from which VBS client accounts are accessed online; utilizing a "trigger system" in the VBS order management system, which systematically flags and initiates a manual review or system block of all orders for purchases that exceed a threshold number of shares and/or dollar values; sharing information among other brokerage firms; identifying trades that may be out of the normal pattern for a particular client or a group of clients; reviewing alerts from market centers; and evaluating inquiries from clients.

8. VBS client ▇▇▇▇▇▇▇ maintains an ▇▇ (▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇) with VMC, account number ▇▇▇▇▇▇. On July 6, 2006, between 11:35 a.m. and approximately 1:40 p.m. EST, an unauthorized person accessed the ▇▇▇▇▇▇ account online at Vanguard's website by entering the client's user name and password and placed in the account 29 buy orders for Dime Bancorp Inc. New Litigation Tracking Warrant (DIMEZ) (2,802,838 shares total) at prices ranging from $0.19 per share to $0.30 per share (for a total purchase of $745,931.00 worth of shares). In addition, an intruder placed one buy order at prices ranging from $0.30 per share to $0.33 per share and one sell order at prices ranging from $0.29 per share to $0.31 per share for Media Bay Inc. (MBAY) (30,000 shares each for a total purchase of $9,639.90 worth of shares and a total sale of $8,729.73 worth of shares). The ▇▇▇▇▇▇ account was accessed on

that day from the following unauthorized IP addresses: 69.183.143.27 and 69.245.240.26.

9.     By approximately 1:40 p.m., following review of orders triggered by an automated process in the VBS order management system, VBS trade management identified the trades as possibly unauthorized and suspended activity in the account pending further investigation of the trading.

10.     VMC has determined that the purchases of DIMEZ shares and the purchase and sale of MBAY shares in the █████████ account on July 6, 2006 were unauthorized. VMC made this determination in part by interviewing the client and obtaining an affidavit from the client asserting that the trades were unauthorized; comparing the IP addresses from which the client previously accessed the account with the IP addresses from which the questioned trades were placed on July 6, 2006; consulting information provided by other brokerage firms regarding securities possibly connected to fraudulent activity outside Vanguard; and taking into consideration the apparently manipulative nature of the trades (i.e., aggressive orders apparently meant to influence the price of the stock with little regard for gain or loss in the account).

11.     The unauthorized purchases of DIMEZ shares and the purchase and sale of MBAY shares resulted in net losses of $398,614.33 and $910.17, respectively. VMC restored the █████████ account to the position it would have been in but for the July 6, 2006 DIMEZ and MBAY trades, at an expense to the firm of $399,525.00. This amount resulted from the cancellation of the unauthorized trades out of the client's account, the movement of those trades to the firm's account, and the subsequent sale from the VMC

firm account, at a loss, of the DIMEZ shares fraudulently purchased in the ███████ account.

12.    Vanguard has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected client's account number and contact information, (b) the unauthorized Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 25, 2007

*Pauline C Scalvino*
Pauline C. Scalvino

ATTACHMENT  H

## **DECLARATION OF KIMBERLY MILLER**

I, Kimberly Miller, pursuant to 28 U.S.C. §1746, declare that:

1.  I am employed by Penson Financial Services, Inc. ("Penson") as a Compliance

    Specialist and Records Production Manager.  By reason of my position I am

    authorized and qualified to make this Declaration.  My responsibilities include

    oversight of the records production department and other compliance related

    tasks.  As a Compliance Specialist, I am familiar with Penson's recordkeeping

    practices, including Penson's procedures relating to the maintenance of electronic

    records.  In addition, I am familiar with the contents of the records maintained by

    Penson, including, but not limited to, the contents of Penson's account opening

    documents, account statements and trade blotters.

2.  Penson acts as a clearing broker for Pinnacle Capital Markets, LLC ("Pinnacle"),

    a registered broker-dealer located in Raleigh, North Carolina.  In its capacity as

    Pinnacle's clearing broker, Penson maintains in its records documents relating to

    customer accounts maintained by Pinnacle whose trades clear through Penson.

    These documents include account opening documents for omnibus and sub-

    accounts, including, but not limited to, new account approval forms, customer

    account agreements, relevant tax forms, copies of customer identification

    information and trading authorization forms, and monthly and periodic statements

    issued by Pinnacle for its customers' accounts.

3.  Penson has received several requests for documents from the staff of the

    Securities and Exchange Commission (the "Staff"), requesting, among other

things: (a) account opening documents for accounts titled in the name of JSC Parex Bank ("Parex"), (b) monthly and periodic account statements for accounts titled in the name of Parex; (c) trade blotters indicating specific times that trades were placed in certain accounts titled in the name of Parex; (d) documents reflecting correspondence with Parex; and (e) incoming and outgoing wire information for certain accounts titled in the name of Parex. Pursuant to these requests, Penson has provided the Staff with responsive documents relating to an omnibus account and sub-accounts accounts titled in the name of Parex.

4. The account opening documents for Parex state that it is a foreign entity whose address is 3 Smilshu Street, Riga, Latvia, LV-1522.

5. According to records maintained by Penson, Parex opened an omnibus brokerage account titled in Parex's name at Pinnacle in June 2002 and, since then, has opened a total of seventy-five (75) sub-accounts of the omnibus account titled in Parex's corporate name. The most recent sub-account was opened in December 2006. According to the account opening documents, the sub-accounts shall not be treated as separate accounts for any purpose except to separate securities into separate groups for the convenience of the customer to view the sub-accounts.

6. According to the records maintained by Penson, there are a total of twenty (20) beneficial owners of the omnibus account, who are residents of Russia, Latvia, Lithuania or the British Virgin Islands. The documents provided to Penson do not reveal whether there are individual owners of the sub-accounts

7. The Corporate Account Agreement maintained by Penson that were executed on behalf of Parex list the bank's president, vice president and chairman of the board

as the individuals authorized to open accounts and trade in the account and sub-accounts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 3/2/07, 2007.

Kimberly Miller